IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Case No. 23-cv-02257

KURT DENNIS,

     Plaintiff,

v.

SCHOOL DISTRICT NO. 1 d/b/a DENVER PUBLIC SCHOOLS;
SUPERINTENDENT ALEX MARRERO, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION PRESIDENT XÓCHITL GAYTÁN, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION VICE PRESIDENT AUON'TAI ANDERSON, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION TREASURER SCOTT ESSERMAN, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION SECRETARY MICHELLE QUATTLEBAUM, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION MEMBER CARRIE OLSON, in her individual and official capacities; and
DENVER PUBLIC SCHOOL BOARD OF EDUCATION MEMBER CHARMAINE LINDSAY, in her individual and official capacities,

     Defendants.

---

## COMPLAINT AND JURY DEMAND

---

     Plaintiff Kurt Dennis ("Mr. Dennis"), by and through his attorneys, David Lane, Andrew McNulty, and Madison Lips of KILLMER, LANE & NEWMAN, LLP, alleges and avers the following:

## **INTRODUCTION**

1.      Colorado has a long and tragic history of school shootings, beginning with the Columbine High School shooting on April 20, 1999. Since that awful day, more than 356,000 students in the U.S. have experienced gun violence at school.[1] Each day 12 children die from gun violence in America, and another 32 are shot and injured.[2]

2.      There is no doubt that gun violence in schools is one of the greatest issues of public concern of our time – indeed, many believe we are currently experiencing an epidemic of gun violence.[3]

3.      Over the decades, public officials have grappled with how to prevent these horrific acts of violence and to keep guns out of schools. One thing is widely agreed upon – that preemptively acting on safety concerns before shootings saves lives.

4.      On March 22, 2023, two school administrators were shot and wounded by a high school student at Denver's East High School while conducting a daily pat-down of the student. This pat-down procedure was mandated by Defendant School District No. 1 d/b/a Denver Public Schools (hereinafter "DPS") policies based on a threat assessment and safety plan for the student, who had previously been charged with firearm-related offenses.

---

[1] John Woodrow Cox, Steven Rich, Linda Chong, Lucas Trevor, John Muyskens and Monica Ulmanu. "More than 356,000 students have experienced gun violence at school since Columbine," *Washington Post*, updated June 11, 2023 (https://www.washingtonpost.com/education/interactive/school-shootings-database/)
[2] Lois K. Lee, M.D., M.P.H., Katherine Douglas, M.D., and David Hemenway, Ph.D. "Crossing Lines — A Change in the Leading Cause of Death among U.S. Children," *N Engl J Med*, 386:1485-1487 (2022) (https://www.nejm.org/doi/full/10.1056/NEJMp2200169)
[3] Destinee Adams, "Is gun violence an epidemic in the U.S.? Experts and history say it is," *NPR*, June 29, 2023 (https://www.npr.org/2023/06/29/1184731316/gun-violence-epidemic-suicide-mass-shooting-public-health-emergency-chicago)

5.      The administrators who were shot were forced by DPS policy to pat-down this student upon entering the building in the morning. They had no training whatsoever in how to effectively pat down someone who was suspected of being dangerous, violent, and in possession of a gun.

6.      On March 24, 2023, Plaintiff Kurt Dennis, then Principal of McAuliffe International School, a public middle school in Denver, revealed to the press that he and his staff were being forced to conduct the exact same pat-down policy with a student similarly charged with firearm-related and violent offenses.

7.      The student at McAuliffe was criminally charged with attempted murder after entering a liquor store to rob it, and shooting the clerk behind the counter.  The Denver Police Department recommended that this student should not be permitted on campus. The police recommendation indicated that they believed this student,  if allowed on campus, would be a danger, to other students, administrators, faculty and staff.  Prior to the shooting at East High School, Mr. Dennis requested that this student be educated through a remote learning process until the extremely serious criminal charges pending against him could be resolved.  The Defendants refused to listen to Mr. Dennis's pleas and denied his request to have this student learn remotely.  Finding no recourse through DPS administrative channels, Mr. Dennis exercised his right to free speech on a matter of great public concern and decided to shine a light on the danger DPS was imposing on the McAuliffe International community, by giving an interview with a reporter named Chris Vanderveen of KUSA TV (9News) in Denver.

8.      In response, the Defendants retaliated against Mr. Dennis for exercising his free speech rights by terminating his employment.

9.      In response to fierce public criticism of DPS regarding Mr. Dennis's termination, Defendants publicly advanced numerous pretextual reasons for the termination and made public and defamatory statements about Mr. Dennis that seriously damaged his reputation and his subsequent job search.

10.     Defendants made statements associating Mr. Dennis with the white supremacy movement and made it clear that they were smearing him in public as a racist.

11.     After harming his reputation, Defendants failed to provide Mr. Dennis with a meaningful opportunity to clear his name or to present evidence in his defense before a decisionmaker through post-termination proceedings, in violation of his Fourteenth Amendment right to procedural due process.

12.     Defendants' unlawful retaliation and subsequent defamation were clearly designed to punish Mr. Dennis for his First Amendment protected speech and to silence him on this matter of both local and national importance.

## JURISDICTION AND VENUE

13.     Mr. Dennis brings this action pursuant to 42 U.S.C. §§ 1983, 1985, and 1988 for violation of civil rights under the First and Fourteenth Amendments to the United States Constitution.

14.      This Court has subject matter jurisdiction over his matter pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1343(a)(3) (civil rights violation), and 28 U.S.C. § 2201 (declaratory relief).

15.     This Court has personal jurisdiction over Defendants, who reside in and conduct business in the District of Colorado.

4

16.     Venue is proper in the District Court for the District of Colorado pursuant to 28 U.S.C. § 1391 because the unlawful practices alleged herein occurred within the District of Colorado.

## PARTIES

17.     Plaintiff, Kurt Dennis, is a United States citizen and resident of Denver, Colorado.

18.     Defendant DPS is a public school system located in the City and County of Denver that is funded, in part, by Denver taxpayers and governed by elected officials on the DPS Board of Education (hereinafter "BOE").

19.     Defendant Alex Marrero is the Superintendent of DPS, and is a resident and domiciled in the State of Colorado. DPS' Board of Education has issued policies that vest Defendant Marrero with authority to make all operational decisions on behalf of DPS and to implement DPS' policies and procedures. At all times relevant, Defendant Marrero was acting under color of state law and in his capacity as Superintendent of DPS. Defendant Marrero is sued in his official and individual capacities.

20.     Defendant Xóchitl Gaytán is the President of the DPS Board of Education, and is a resident and domiciled in the State of Colorado. At all times relevant, Defendant Gaytán was acting under color of state law and in her capacity as President of the DPS Board of Education. Defendant Gaytán is being sued in her official and individual capacities.

21.     Defendant Auon'tai Anderson is the Vice President of the DPS Board of Education, and is a resident and domiciled in the State of Colorado. At all times relevant, Defendant Anderson was acting under color of state law and in his capacity as Vice President of

the DPS Board of Education. Defendant Anderson is being sued in his official and individual capacities.

22.     Defendant Scott Esserman is the Treasurer of the DPS Board of Education, and is a resident and domiciled in the State of Colorado. At all times relevant, Defendant Esserman was acting under color of state law and in his capacity as Treasurer of the DPS Board of Education. Defendant Esserman is being sued in his official and individual capacities.

23.     Defendant Michelle Quattlebaum is the Secretary of the DPS Board of Education, and is a resident and domiciled in the State of Colorado. At all times relevant, Defendant Quattlebaum was acting under color of state law and in her capacity as Secretary of the DPS Board of Education. Defendant Quattlebaum is being sued in her official and individual capacities.

24.     Defendant Carrie Olson is a Member of the DPS Board of Education, and is a resident and domiciled in the State of Colorado. At all times relevant, Defendant Olson was acting under color of state law and in her capacity as Member of the DPS Board of Education. Defendant Olson is being sued in her official and individual capacities.

25.     Defendant Charmaine Lindsay is a Member of the DPS Board of Education, and is a resident and domiciled in the State of Colorado. At all times relevant, Defendant Lindsay was acting under color of state law and in her capacity as Member of the DPS Board of Education. Defendant Lindsay is being sued in her official and individual capacities.

## **STATEMENT OF FACTS**

### **Kurt Dennis has a long and well-established history of success as an educator and principal.**

26.     Mr. Dennis started his career teaching English as a second language (ESL) to recently arrived immigrant students in 2000 at Ranum High School in Westminster, Colorado.

27.     Over the seven years that he worked at Ranum as an ESL teacher, Mr. Dennis developed and implemented a "Newcomers Program" to support ESL students in all their classes by recruiting and training a cohort of teachers to use "sheltered English" when teaching other subjects. He also helped parents of students navigate systems in the U.S. and access resources to ease their transition.

28.      In 2007, Mr. Dennis moved into an Assistant Principal position at Ranum. He held administrative positions at middle and high schools in Westminster, Colorado for the next four years as Ranum closed and a new Westminster High School opened.

29.     In 2011, Mr. Dennis was selected to lead as Principal in the opening of a new middle school in Denver's Central Park (then called Stapleton) neighborhood. The school would be called McAuliffe International School, and it would be an "innovation school" within DPS, meaning it would have greater autonomy and managerial flexibility in order to implement diverse approaches to learning.

30.     Mr. Dennis and his family had been living in the Central Park neighborhood for eight years by that time, and he gladly accepted the opportunity to build a school with a new approach in his own community.

31.     During the 2011-2012 school year, called "Year Zero" by DPS, Mr. Dennis spent his time engaging with parents and children in the community to identify and define a vision and mission for the school. The vision that emerged from that community collaboration was of a school that prioritized rigorous instruction and high achievement for all students, emphasizing a

non-tracking "honors for all" model with a strong commitment to diversity, equity, and inclusion.

32.     When the school opened for the 2012-2013 school year, 150 students enrolled. Word quickly spread of the school's success – the next year, 250 more students enrolled, bringing the total number to 400.

33.     After the second year of operation, the school had outgrown its campus and was moved to the Smiley campus in Park Hill where it merged with Smiley Middle School. This brought enrollment up to 750 students.

34.     Over the next ten years, Mr. Dennis led McAuliffe International School to some of the district's best results, most notably for students of color. Today, around 1500 students are enrolled in the school.

35.     In 2016, McAuliffe International joined the Northeast District Innovation Zone (NDIZ), which was a new initiative to promote further autonomy and innovative thinking in schools while still partnering with public school districts. NDIZ, a nonprofit organization, and DPS entered a contract to collaborate in running the school, following a new model of more autonomous education management.  Colleen O'Brien was Kurt Dennis's supervisor in the NDIZ.

36.     The innovation zone model, and Mr. Dennis's leadership, resulted in impressive outcomes. McAuliffe International serves more students of color than any other middle school in the district and is consistently one of the most sought after middle schools for families of color in DPS.

37.    In the 2021-2022 school year, the average McAuliffe student outperformed 97% of their peers statewide on the standardized Colorado Measures of Academic Success (CMAS) test.

38.    The average McAuliffe student of color outperformed 88% of their peers on the 2021-2022 CMAS test.

39.    The average McAuliffe student on an Individualized Education Plan due to a disability outperformed 61% of their peers statewide on the 2021-2022 CMAS test.

40.    In the last year that DPS rated schools for equity on the School Performance Framework (2019), McAuliffe International was one of only 10 schools (out of over 220 schools in the district) to be rated "Distinguished for Equity."

41.    In 2019, McAuliffe International was a finalist for the Colorado Succeeds Prize, an award that recognizes the innovations of Colorado's most forward-thinking educators.

42.    In 2020, McAuliffe International was recognized as a School of Excellence by the U.S. Department of Education with a Blue Ribbon Award. Only four Colorado schools were chosen that year for the prestigious national award, which honors both high-achieving schools as well as schools that have made significant progress in closing the achievement gap.

43.    Every year while serving as Principal of McAuliffe, Mr. Dennis was rated 90% or higher on the DPS CollaboRate Staff Survey, an annual survey designed to provide employee feedback to leadership.

44.    Kurt Dennis was consistently one of the top performing principals in the DPS system and received exemplary reviews from parents, staff, faculty and DPS during his tenure as

the McAullife Middle School principal and at the time of his termination was performing his job as a school principal at an extraordinarily high level.

### DPS forced McAuliffe International administrators to conduct unsafe "pat-downs" on a student identified as a significant safety risk.

45.    At some point prior to 2023, DPS instituted a policy requiring school administrators to conduct "pat-downs" of certain students on Safety Plans.

46.    Administrators were never trained by DPS on how to conduct a pat-down in a safe and effective way. Administrators did their best to thoroughly check for weapons or contraband without violating a student's privacy, attempting to imitate what they had seen at airport security.

47.    DPS provided no training to administrators on what to do if a student was carrying a dangerous weapon, such as a firearm.

48.    Students on Safety Plans that are subject to daily pat-downs are already known by most everyone at the school, including fellow students, as "dangerous" and being patted down. Typically, when such a student would arrive at school in the morning, an administrator would meet them at the door and escort them into a private office or room, conduct the pat-down with another administrator present, and then the student would be escorted back to class.  Oftentimes that student would be wearing a GPS ankle bracelet ordered by the court to track the student's movements.  Through no fault of Mr. Dennis, the identity of these students is, and always has been, widely known by other students and faculty throughout the school.

49.    On January 25, 2023, the Denver District Attorney's office alerted Mr. Dennis that one McAuliffe International student had been charged with possession of an illegal firearm.

50.    On February 15, 2023, the Denver DA's office alerted Mr. Dennis that the same student had been charged with eight additional crimes in a separate and unrelated case. One of

the charges was attempted murder, robbery, and other firearm-related offenses. The student was accused of entering a liquor store to rob it and shooting the clerk behind the counter.

51.    Mr. Dennis and his administrative staff were directed by DPS to perform a Threat Assessment for the student. The finding was that the threat was a High Level of Concern.

52.    Mr. Dennis and his administrative staff felt that the student had demonstrated that they could be a danger to others within the school. Without more training or support to ensure this student did not bring a weapon to school, Mr. Dennis felt it was not safe for the student to be physically in school with the 1,500 other students at McAuliffe International.

53.    Mr. Dennis's fears were compounded by a Denver Police Department statement that they felt this student posed a danger to the McAuliffe community and should not be on campus.

54.    Mr. Dennis feared for the safety of the school administrators who would be forced to conduct a daily pat-down, as well as the students, faculty and staff at McAuliffe. If this student brought a weapon to school and attempted to use it, the administrators had no training on how to prevent that or method for stopping it if shooting began.

55.    Under C.R.S. § 22-33-105(5)(a), whenever a juvenile student is charged with a violent offense (such as attempted murder), the district's school board shall determine "whether the student has exhibited behavior that is detrimental to the safety, welfare, and morals of the other students or of school personnel in the school and whether educating the student in the school may disrupt the learning environment in the school, provide a negative example for other students, or create a dangerous and unsafe environment for students, teachers, and other school personnel." If such a determination is made, the school board may proceed with suspension or

expulsion, or alternatively, may provide for online education for the student while the charges are pending. C.R.S. § 22-33-105(5)(a).

56.    On February 27, 2023, believing that this student had exhibited dangerous and unsafe behavior, Mr. Dennis asked DPS to transfer the student to an online education program while the charges were pending. Mr. Dennis's request was denied by DPS, who claimed that despite the extremely violent act allegedly perpetrated by the student, because the alleged violent act did not occur on school grounds, the student should be permitted to remain physically in school.

57.    On February 28, 2023, Mr. Dennis sought to initiate expulsion proceedings for the student through DPS's formal process. DPS again denied that request, citing the same reasons. Instead, DPS directed Mr. Dennis to return the student to school the next day, March 1, 2023, with full implementation of a Safety Plan.

58.    Between March 1, 2023 and March 24, 2023, DPS guided the development of a Safety Plan for the student to attend classes on campus in person. Despite not having any training or guidance on how to perform this task, administrative staff members were required to search and pat-down the student every day when they arrived at school in order to make sure that the student was not in possession of any weapons.

59.    The student was wearing a visible ankle monitor as a condition of bond, alerting others that the student was facing criminal charges. The pat-down policy further singled out the student, as well as the fact that the student was being escorted at all times by a staff member throughout the school day as part of the Safety Plan.

60.    DPS thus forced Mr. Dennis and his staff to perform daily pat-downs on this student, despite their major safety concerns which constituted obvious grounds under state law to either expel the student or move them to online learning.

**Mr. Dennis voiced his concerns to the media after two administrators were shot while conducting a DPS-mandated pat-down at East High School.**

61.    On March 22, 2023, a 17-year-old student named Austin Lyle was being patted down by two administrators at East High School when the administrators found a gun on the student. Lyle took out the gun and fired several shots, injuring both administrators before exiting the building. Lyle then proceeded take his own life.

62.    The immediate investigation revealed that Lyle had previously been expelled from Overland High School due (at least in part) to his possession of an AR-15 semi-automatic rifle. The student was subsequently enrolled at East High School and placed on a Safety Plan by DPS which included daily pat-downs.

63.    The shooting prompted DPS families to call for an overhaul of DPS safety policies. DPS was publicly criticized for forcing unarmed and untrained administrators to conduct the pat-down searches as opposed to a trained school security officer.

64.    Seeing the risk of a similarly devastating occurrence at McAuliffe International, Mr. Dennis felt that DPS families needed to know the extent to which DPS had forced this dangerous policy on its staff and students.

65.    On March 24, 2023, Mr. Dennis decided to speak to the press to publicly criticize DPS for its pat-down policy and refusal to remove the McAuliffe International student charged with attempted murder.

66.     Mr. Dennis spoke to a reporter named Chris Vanderveen with 9News outside of school hours. He did so in his private capacity, though he used his knowledge gained as principal of McAuliffe International to inform the public of a matter that greatly impacted DPS students and families. The story ran on the evening news on March 24, 2023 (available here: https://www.9news.com/article/news/investigations/dps-denver-student-accused-attempted-murder-placed-middle-school-despite-fears-principal-denver-police/73-a71dd1c5-8307-4ef1-b5b6-b0799d5ad992) .

67.     Mr. Dennis was careful not to mention the student's name, age, gender, or any other personally identifying information in his interview.

68.     Mr. Dennis provided the press with documents related to the student's charges, which were redacted to remove all personally identifying information about the student. These documents were mandatorily available to the public under state law, and were not protected from disclosure under the federal Family Educational Rights and Privacy Act (FERPA).

69.     Mr. Dennis's actions were entirely lawful and carefully considered to protect the confidentiality of the student.

**Mr. Dennis's employment was terminated by DPS because he publicly criticized the school district in the media.**

70.     Approximately two weeks after Mr. Dennis spoke to the media, on April 7, 2023, DPS sent Mr. Dennis's supervisor, Colleen O'Brien a "letter of concern" regarding "[her] ability to effectively oversee Kurt Dennis." This was the extent of Defendants' communication with Ms. O'Brien prior to Mr. Dennis's termination. Under the contract between DPS and NDIZ, the Defendants were obligated to obtain Ms. O'Brien's consent prior to terminating Mr. Dennis.

The Defendants never attempted to obtain her consent as it was clear that it was not going to be given.

71.    The letter cited several investigations that DPS had conducted over the years based on occasional complaints from parents or staff. All prior investigations cited had come back "unfounded" as to Mr. Dennis, showing no DPS policy violations of any kind. Indeed, many of the issues investigated implicated broader DPS problems regarding funding and resources.

72.    On April 20, 2023, without notifying Mr. Dennis or Ms. O'Brien, the DPS Board of Education posted to their public agenda that their evening meeting included moving to Executive Session for the purpose of receiving legal advice concerning specialized details of security arrangements at McAuliffe International, as well as entering into conference with an attorney for the purposes of receiving legal advice concerning "personnel matters."

73.    DPS needed to discuss "personnel matters" in private executive sessions as statutorily, it would be violative of the law to discuss these matters in public.

74.    On April 24, 2023, Mr. Dennis received an "urgent" phone call from DPS Director of Human Resources Debra Watson requesting that he submit to an interview with her. Her stated purpose was that the district was in a "fact-gathering investigation" to determine if Board of Education policies had been violated by Mr. Dennis. Mr. Dennis participated in the 20-minute interview.

75.    On July 3, 2023, Mr. Dennis received two letters – one from Ms. Watson outlining a number of claimed violations of policy and law surrounding the circumstances of the student on the Safety Plan, and another from Grant Guyer, Associate Chief of Strategic

Operations for DPS, informing Mr. Dennis of his termination from his position as Principal of McAuliffe International. The termination letter cited the circumstances surrounding the student on the Safety Plan including Mr. Dennis's decision to speak to 9News, as well as various other complaints over the years that had all been proven unfounded or not violative of DPS policy.

76.     The reasons set forth in both termination letters were pretextual and were not the actual reasons for Mr. Dennis's termination.

77.     The actual reasons for Mr. Dennis's termination were to retaliate against him for speaking critically to the media about the DPS policy of allowing violent students to remain on campus and to silence him from further criticizing DPS policies while he remained as the principal of a school.

78.     News of Mr. Dennis's termination shocked and angered many parents and students in the McAuliffe International community. On July 12, 2023, supporters rallied outside McAuliffe International to voice their opposition to DPS's actions in terminating Mr. Dennis. Some teachers expressed their fears that speaking out in support of Mr. Dennis would lead DPS to retaliate against them as well.

79.     Prior to terminating Mr. Dennis, DPS failed to consult with Ms. O'Brien or anyone else associated with the Northeast Denver Innovation Zone (NDIZ) before terminating Mr. Dennis, in violation of the NDIZ-DPS contract for McAuliffe International School, which states that "The District will not take action regarding the selection, retention or removal of school leaders without seeking the approval of NDIZ. If the parties fail to agree, either party may bring the dispute to the DPS Board of Education."

80.    Defendant Marrero announced that he was terminating Mr. Dennis on July 3, 2023.  His decision to terminate Mr. Dennis was made in retaliation for Kurt Dennis having spoken critically to the media about the policy promulgated by Marrero and the other defendants which allows extremely violent students to stay on campus.  This was in violation of Mr. Dennis's rights under the First Amendment to the United States Constitution.

81.    Defendant Marrero's termination of Mr. Dennis was designed to silence Mr. Dennis and prevent him from making any more public statements in his position as the principal of McAuliffe Middle School, in violation of Mr. Dennis's right to free speech under the First Amendment to the United States Constitution.

### Mr. Dennis had no meaningful opportunity to clear his name as DPS continued to pile on additional allegations of wrongdoing and false statements that harmed Mr. Dennis's reputation.

82.    Despite the statutorily mandated privacy concerns regarding discussing personnel matters publicly, on August 1, 2023, DPS School Board Members Auon'tai Anderson, Scott Esserman, and Michelle Quattlebaum held a public town hall meeting to discuss Mr. Dennis's termination. At this meeting, the school board members publicly distributed Mr. Dennis's termination letter which included the Dennis family's home address, all in violation of DPS policies on ongoing investigations and personal privacy of DPS staff. This also violated Colorado state law under C.R.S. §22-9-109, mandating confidentiality in personnel evaluations.

83.    In the first week of August 2023, DPS BOE Vice President Auon'tai Anderson publicly claimed he had received whistleblower reports that Mr. Dennis had improperly used a de-escalation room at McAuliffe International during the 2022-2023 school year. Although DPS policies permit "monitored de-escalation rooms" for students under certain circumstances, DPS

17

claimed that Mr. Dennis violated these policies by monitoring escalated students from outside the de-escalation room rather than from inside the room and by latching the door from the outside.

84.     While DPS policy mandates that when a student is placed in a "de-escalation room" the administrator should be in the room with that student, DPS policies provide no instruction or mandate whatsoever on how school administrators should safely monitor a student from inside a room when a student is violently escalated and is physically attacking that administrator, nor do DPS policies instruct school administrators on how to prevent a physically violent and escalated student from leaving a de-escalation room and potentially harming themselves or others.

85.     The only time Kurt Dennis was not in a de-escalation room with a student was when that student remained 'escalated' and was physically violent toward Mr. Dennis. With no DPS policy on-point, Mr. Dennis would leave the room for his own safety, hold the door closed and monitor the student through the door's window until the student was de-escalated, at which time he and the school psychologist would enter the room and counsel the student. At no time was any student simply locked into a room and left unmonitored by an administrator.

86.     Typically, the escalated students would engage in a tug-of-war to open the door being held shut by Mr. Dennis and try to leave the room, so a small latch was installed as Mr. Dennis feared that someone's finger would be slammed in the door.

87.     The latch was removed when staff became worried about being accidentally locked into the room with an escalated student and being unable to quickly escape.

18

88.     Certain Defendants, specifically Defendants Anderson, Esserman and Gaytán, referred to the de-escalation room, which is approved DPS policy, as an "incarceration room" in an effort to turn public opinion against Mr. Dennis. DPS initiated an investigation into this alleged "incarceration room."  Defendant Anderson went so far as to make a report to the Denver Police Department that Mr. Dennis was engaged in criminal conduct against students by placing them into the DPS-approved de-escalation room. At this time, the Denver Police Department has contacted counsel for Mr. Dennis, made inquiries about the de-escalation room and has not filed criminal charges against Mr. Dennis.

89.     Since the first week of August, various DPS BOE members have made numerous public statements in their official capacities at press conferences, to the media, and on their official social media pages accusing Mr. Dennis of using this de-escalation room exclusively for students of color, along with numerous accompanying accusations of racism and white supremacy. The claim that the de-escalation room was used only for students of color is demonstrably false.

90.     Since his initial termination letter, Mr. Dennis had been seeking employment in other school districts. Thus far his search for a new position has been unsuccessful.

91.     Mr. Dennis has been unable to find a comparable position in another district because the defamatory statements of the Defendants have so tarnished his reputation that no employer will hire him as a principal.

92.     Defendants never offered Mr. Dennis an opportunity for a public name-clearing hearing. Nor was he offered an opportunity to present evidence and confront accusers before a decisionmaker.

93.     On August 24, 2023, the DPS School Board voted 6-1 in favor of terminating Mr. Dennis, thereby fully ratifying the decision to terminate Mr. Dennis. Board Member Scott Baldermann voted against the termination, citing the school board's failure to follow its own confidentiality rules and state law regarding staff disciplinary actions as his reason.

94.     The six named individual Defendant Board members voted to terminate Kurt Dennis's employment in retaliation for his First Amendment protected speech in talking to the media about the extremely unsafe conditions promulgated by the Defendants in allowing violent students to remain on campus.

95.     The six named individual Defendant Board members voted to terminate Kurt Dennis's employment in order to silence him and prevent further criticism of the Defendant's policies which result in extremely dangerous conditions for the school community, in violation of Kurt Dennis's rights under the First Amendment.

96.     On August 28, 2023, DPS sent Mr. Dennis an updated termination letter adding the alleged policy violations concerning the de-escalation room as a reason for termination.

97.     On August 31, 2023, Vice President Auon'tai Anderson held a solo press conference. He again falsely stated that Mr. Dennis only used the alleged "seclusion room" for students of color, amplifying his prior reputationally damaging accusations of racism and white supremacy.

98.     DPS is using pretextual reasons to attempt to bury the fact that the actual termination was in retaliation for Mr. Dennis talking to the media about the extremely dangerous policy of allowing students charged with violent crimes to attend school and be patted down by

untrained administrators and to prevent him from making further public statements while in his position as a school principal.

99.    The actions of the Defendants caused serious reputational harm in the course of this termination. Ultimately, Defendants are retaliating against Mr. Dennis, who exercised his right to free speech when he publicly criticized DPS and its unsafe policies in an effort to protect his students and staff from the horrifying specter of gun violence.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Violation
### Free Speech
*Against All Defendants*

100.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

101.    At all times relevant to this Complaint, Defendants were acting under the color of law.

102.    Defendants are "persons" under 42 U.S.C. § 1983. Seven Defendants are sued in their individual and official capacities, and the Board is sued as the final policy/decision maker in its official capacity.

103.    Plaintiff was engaged in First Amendment-protected speech as outlined above.

104.    Plaintiff's speech was on a matter of public concern and did not violate any law.

105.    Plaintiff's speech was not made pursuant to his official duties.

106.    Plaintiff's speech was not disruptive and Defendant DPS's interests did not outweigh Plaintiff's free speech interests.

107.    Defendants would not have terminated Plaintiff if he had not engaged in First Amendment-protected conduct.

108.    Defendants' termination of Plaintiff was substantially motivated by his First Amendment protected activity.

109.    The actions of Defendants can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

110.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

111.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

112.    At the time when Defendants retaliated against Plaintiff for speaking out, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to engage in the above-described activity. Any reasonable public official knew or should have known of this clearly established right. See *Schalk v. Gallemore*, 906 F.2d 491, 499 (10th Cir. 1990).

113.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

114.    The DPS, and the individual Defendant Superintendent and School Board Members, as final policymakers for Defendant DPS, authorized and ratified the termination in retaliation for Mr. Dennis's exercise of free speech in violation of Plaintiff's constitutional rights.

115.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

116.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

117.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 – First Amendment Retaliation
*Against All Defendants*

118.    Plaintiff hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

119.    At all times relevant to this Complaint, Defendants were acting under the color of law.

120.    Defendants are "persons" under 42 U.S.C. § 1983. Seven Defendants are sued in their individual and official capacities, and the Board is sued as the final policy/decision maker in its official capacity.

121.    Plaintiff was engaged in First Amendment-protected speech as outlined above.

122.    Plaintiff's speech was on a matter of public concern and did not violate any law.

123.    Plaintiff's speech was not made pursuant to his official duties.

124.    Plaintiff's speech was not disruptive and Defendant DPS's interests did not outweigh Plaintiff's free speech interests.

125.    Defendants would not have terminated Plaintiff if he had not engaged in First Amendment-protected conduct.

126.    Defendants' termination of Plaintiff was substantially motivated by his First Amendment protected activity.

127.    The actions of Defendants can be expected to chill a reasonable person from engaging in activity protected by the First Amendment.

128.    Defendants' actions were a content-based and/or viewpoint-based restriction of Plaintiff's expression.

129.    Defendants, collectively, failed to intervene to prevent each Defendant from violating Plaintiff's constitutional rights.

130.    At the time when Defendants retaliated against Plaintiff for speaking out, Plaintiff had a clearly established constitutional right under the First Amendment to the United States Constitution to engage in the above-described activity. Any reasonable public official knew or should have known of this clearly established right. See *Schalk v. Gallemore*, 906 F.2d 491, 499 (10th Cir. 1990).

131.    Defendants engaged in their conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

132.    The DPS, Defendant Marrero, and the individual School Board Members, as final policymakers and decision makers for Defendant DPS, authorized and ratified the termination in retaliation to Mr. Dennis's exercise of free speech in violation of Plaintiff's constitutional rights.

133.    As a direct and proximate cause and consequence of Defendants' unconstitutional acts and omissions, described above, Plaintiff suffered injuries, damages, and losses.

134.    Defendants' herein described acts or omissions were the moving force and the legal, direct, and proximate cause of Plaintiff's injuries and losses, including but not limited to non-economic damages, economic damages, the physical and mental pain and anguish Plaintiff suffered, and other compensatory and special damages.

135.    Defendants' intentional actions or inactions as described herein intentionally deprived Plaintiff of due process and of rights, privileges, liberties, and immunities secured by the Constitution of the United States of America.

**THIRD CLAIM FOR RELIEF**
**Fourteenth Amendment Due Process**
**Liberty Interest in Good Name and Reputation**
*Against All Defendants*

136.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

137.    The Fourteenth Amendment to the United States Constitution provides that no state may deprive a person of life, liberty, or property without due process of law. Section 25 of Article II of the Colorado Constitution provides similar guarantees and protections.

138.    Mr. Dennis was deprived of a liberty interest without due process.

139.    As a public employee, Mr. Dennis has a liberty interest in his good name and reputation as they relate to his continued employment.

140.    Defendants infringed upon that interest when: (1) they made statements that impugned Mr. Dennis's good name, reputation, honor, or integrity; (2) the statements made were

false; (3) the statements were made during the course of termination and foreclosed other employment opportunities; and (4) the statements were published.

141.    Defendants publicly stated at press conferences, to the press, and on social media that Mr. Dennis only used the de-escalation room for students of color. Defendants also publicly extended this claim to accusations that Mr. Dennis is racist and engaging in acts of white supremacy.

142.    However, Defendants knew these statements were false. Within the first week of August, upon information and belief, Defendants received a letter from a white parent explaining how the de-escalation room had been used for her white child as an agreed-upon part of her child's Individualized Education Plan (IEP). She stated that her child prefers to be in the room alone, which is why that action was taken, and that "staff members have only shown us support, compassion and empathy, and they listen to my son's request to be alone in the room with the door closed. They have always provided supervision through the window of the door to ensure his safety."

143.    These allegations by Defendants that only students of color have been placed in the de-escalation room, and the accompanying claims that this was done against the wishes of the families involved as an act of racism and white supremacy, clearly call Mr. Dennis's good name and reputation into question. Mr. Dennis's good name and reputation were seriously impaired in connection with his termination.

144.    Furthermore, DPS, through its Defendant School Board Members,' decisions to speak publicly about Mr. Dennis's termination and investigations into alleged misconduct were

violative of DPS policies and state law (C.R.S. §22-9-109) regarding the confidentiality of staff disciplinary proceedings.

145.    The statements occurred in the course of termination and foreclosed other like-kind employment opportunities for Mr. Dennis.

146.    The false statements by DPS were published, being carried by print, television, official social media pages, and internet news media outlets.

147.    When Mr. Dennis's liberty interest was infringed upon, he was entitled to receive an adequate name-clearing hearing – an opportunity to be heard in public at a meaningful time and in a meaningful manner.

148.    Defendants denied Mr. Dennis due process because they never provided Mr. Dennis with an opportunity for a public hearing to allow him to defend himself from the false accusations of the Defendants.

149.    Mr. Dennis was deprived of a liberty interest in his good name and reputation without due process when Defendants made public the false claim that he was terminated for, among other things, only placing students of color in an "incarceration room," with accompanying allegations of racism and white supremacy.

150.    Acting under color of law, Defendants intentionally violated Mr. Dennis's constitutional rights under 42 U.S.C. § 1983, the Due Process Clause of the Fourteenth Amendment to the United States Constitution, and Article II of the Colorado Constitution, by purposefully depriving Mr. Dennis of his liberty interests when they denied Mr. Dennis a meaningful and public opportunity to be heard and to clear his name.

151.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

152.    Defendants failed to intervene to prevent other Defendants from violating Plaintiff's due process rights under the Fourteenth Amendment and Section 25 of Article II of the Colorado Constitution.

153.    Final policymakers for Defendant DPS authorized the actions that violated Plaintiff's constitutional rights.

154.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Mr. Dennis suffered injuries, damages and other losses, including but not limited to lost wages and benefits, damage to his reputation, and emotional distress. These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

**FOURTH CLAIM FOR RELIEF**
**Fourteenth Amendment Due Process**
**Property Interest in Continued Employment**
*Against All Defendants*

155.    Plaintiff incorporates by reference all previous paragraphs of this Complaint as if fully set forth herein.

156.    The Fourteenth Amendment to the United States Constitution provides that no state may deprive a person of life, liberty, or property without due process of law. Section 25 of Article II of the Colorado Constitution provides similar guarantees and protections.

157.    Mr. Dennis was deprived of a property interest without due process.

158.    As a public employee with a long tenure of success at McAuliffe International, Mr. Dennis has a property interest in his continued employment.

159.    Mr. Dennis and Defendants had a mutually explicit understanding based in a contract between DPS and NDIZ that his employment could not be terminated without consent from NDIZ.

160.    Defendants failed to obtain NDIZ approval before terminating Mr. Dennis, in violation of the contract between DPS and NDIZ.

161.    Defendants were aware that Ms. O'Brien, Mr. Dennis's supervisor at NDIZ, would almost certainly not approve Mr. Dennis's termination so the Defendants simply skipped that step in the termination process, thereby violating Mr. Dennis's right to due process under the United States Constitution.

162.    Defendants failed to provide constitutionally sufficient due process to challenge the termination by failing to provide an opportunity to present evidence in his defense in front of a decisionmaker. Defendants also failed to provide an opportunity for a public hearing.

163.    Acting under color of law, Defendants intentionally violated Mr. Dennis's constitutional rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution, by purposefully depriving Mr. Dennis of his property interests when they failed to abide by the contract with NDIZ, and allow Mr. Dennis a meaningful and public opportunity to be heard in front of any neutral decisionmaker.

164.    Defendants engaged in this conduct intentionally, knowingly, willfully, wantonly, maliciously, and in reckless disregard of Plaintiff's constitutional rights.

165.    Defendants failed to intervene to prevent other Defendants from violating Plaintiff's due process rights under the Fourteenth Amendment.

166.    Final policymakers for Defendant DPS authorized the actions that violated Plaintiff's constitutional rights.

167.    As a direct, foreseeable, and proximate result of the intentional unlawful conduct complained of herein, Mr. Dennis suffered injuries, damages and other losses, including but not limited to lost wages and benefits, damage to his reputation, and emotional distress. These injuries, damages and other losses continue into the present and will continue into the foreseeable future.

## **PRAYER FOR RELEIF**

**WHEREFORE**, Mr. Dennis respectfully requests the following relief:

a.    All appropriate relief at law and equity;

b.    Declaratory relief;

c.    Injunctive relief;

d.    Actual economic damages as established at trial;

e.    Compensatory damages, including, but not limited to those for past and future pecuniary and non-pecuniary losses, physical and mental pain, humiliation, fear, anxiety, loss of enjoyment of life, loss of liberty, privacy, and sense of security and individual dignity, and other non-pecuniary losses;

f.    Punitive damages for all claims as allowed by law in an amount to be determined at trial;

g.    Issuance of an Order mandating appropriate equitable relief;

h.    Pre-judgment and post-judgment interest at the highest lawful rate;

i.    Attorney's fees and costs; and

j.   Such further relief as justice requires.

Dated: September 5, 2023.

Respectfully Submitted,

KILLMER, LANE & NEWMAN, LLP

*s/ David A. Lane*

_____

David A. Lane
Andrew McNulty
Madison Lips
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
amcnulty@kln-law.com
mlips@kln-law.com

ATTORNEYS FOR PLAINTIFF