# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-02257-JLK

KURT DENNIS,

      Plaintiff,

v.

SCHOOL DISTRICT NO. 1 d/b/a DENVER PUBLIC SCHOOLS;
SUPERINTENDENT ALEX MARRERO, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION PRESIDENT XÓCHITL GAYTÁN, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION VICE PRESIDENT AUON'TAI ANDERSON, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION TREASURER SCOTT ESSERMAN, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION SECRETARY MICHELLE QUATTLEBAUM, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION MEMBER CARRIE OLSON, in her individual and official capacities; and
DENVER PUBLIC SCHOOL BOARD OF EDUCATION MEMBER CHARMAINE LINDSAY, in her individual and official capacities,

      Defendants.

---

## MOTION TO DISMISS

---

      Defendants School District No. 1 d/b/a Denver Public Schools ("DPS"), Alex Marrero, Xóchitl Gaytán, Auon'tai Anderson, Scott Esserman, Michelle Quattlebaum, Carrie Olson, and Charmaine Lindsay, by and through undersigned counsel, move[1] pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss this case for failure to state a claim upon which relief can be granted.

---

[1] Pursuant to D.C.COLO.LCivR 7.1(a), undersigned counsel certifies that he conferred with Plaintiff's counsel regarding this motion by sending a substantive email on November 3, 2023 citing the below arguments as bases for dismissal and offering to discuss by phone. Opposing counsel responded that this motion is opposed.

## INTRODUCTION

This is a § 1983 public employment case. DPS terminated Plaintiff Kurt Dennis ("Dennis") from his position as a school principal. Dennis thereafter sued DPS, its Superintendent, and six members of its Board of Education who voted to affirm his termination. Dennis' first and second claims for relief assert he was terminated in retaliation for engaging in speech protected by the First Amendment. His third and fourth claims assert due process violations, respectively citing the infringement of his liberty and property interests.

Dennis' First Amendment claims fail because the speech he cites is not protected by the First Amendment: it was illegal in the first place and made pursuant to his official duties. His due process liberty interest claim fails because he was offered a name-clearing hearing, while his traditional due process claim is subject to dismissal for lack of a property interest and because the hearings he was offered amounted to sufficient process in any event. The individual defendants also assert qualified immunity from all Dennis' claims.

## STANDARD OF DECISION

"To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead sufficient factual allegations to state a claim to relief that is plausible on its face." *Matney v. Barrick Gold of North America*, 80 F.4th 1136, 1144 (10th Cir. 2023) (internal quotation and citation omitted). "To satisfy the plausibility standard, the complaint must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* District courts are to "accept the well-pleaded facts alleged as true and view them in the light most favorable to the plaintiff," but are not bound by "conclusory allegations." *Id.* "Factual allegations that contradict … a properly considered document are not well-pleaded facts that the court must

accept as true." *Id*. at 1145. When adjudicating Rule 12(b)(6) motions, a court may consider evidence referenced in and central to the plaintiff's complaint without conversion to summary judgment. *Geras v. Int's Business Machines Corp.*, 638 F.3d 1311, 1314-15 (10th Cir. 2011) (citation omitted). It may do the same with respect to "matters of public record." *Wvo-Ben Inc. v. Haaland*, 63 F.4th 857, 863 (10th Cir. 2023) (citing 5B Charles Alan Wright & Arthur R. Miller, FEDERAL PRACTICE AND PROCEDURE § 1357 (3d ed.)).

## FACTUAL BACKGROUND

McAuliffe International School ("McAuliffe") is a public middle school within DPS, a Colorado public school district. Complaint and Jury Demand (ECF Doc. 1, hereafter "Complaint"), ¶¶ 6, 18 & 36. Dennis ("Dennis") served as its principal from the 2012-13 through the 2022-23 school years. *Id.*, ¶¶ 31-34 & 80.

DPS entered into a contract with the Northeast Denver Innovation Zone ("NDIZ"), a nonprofit organization, to collaborate in running McAuliffe. *Id.*, ¶ 35. The contract provided that DPS "will not take action regarding the selection, retention, or removal of school leaders without seeking the approval of NDIZ. If the parties fail to agree, either party may bring the dispute to the DPS Board of Education." *Id.*, ¶ 79.

As its principal, Dennis "led" McAuliffe. *Id.*, ¶¶ 29, 34 & 36. Dennis' job description indicates that the objective of his position was to "provide leadership, direction, and support to the implementation of the school's instructional and operational plans." Ex. A, Executive Principal Job Description, p. 1.[2] Public relations and communications components are inherent to the role; the job description indicates one of the position's primary objectives is to "establish and

---

[2] Dennis' job description is a public document that the Court may consider. *See Wyo-Ben Inc.*, 63 F.4th at 863.

communicate the [school's] vision, mission, and culture strategy to internal and external stakeholders." *Id.* To that end, a "key responsibility" is "stakeholder relations: [creating] and [building] collaborative relationships and pro-active communication channels between the district, functions, departments, and external stakeholders." *Id.*, p. 2. Moreover, an "essential function" of the position is "[developing] and [managing] the [school's] public relations program, including community … [and] district relations [and] politics." *Id.*, p. 3.

Another "key responsibility" of Dennis' role as the McAuliffe principal is "[maintaining] and [directing] activities related to the District's safety and security efforts." *Id.*, p. 2. "At some point prior to 2023, DPS instituted a policy requiring school administrators to conduct 'pat-downs' of certain students on Safety Plans." Complaint, ¶ 45. As to such students, Dennis alleges:

> Students on Safety Plans that are subject to daily pat-downs are **already known by most everyone at the school**, including fellow students, as "dangerous" and being patted down. Typically, when such a student would arrive at school in the morning, an administrator would meet them at the door and escort them into a private office or room, conduct the pat-down with another administrator present, and then the student would be escorted back to class. Oftentimes that student would be wearing a GPS ankle bracelet ordered by the court to track the student's movements. **Through no fault of Mr. Dennis, the identity of these students is, and always has been, widely known by other students and faculty throughout the school.**

*Id.*, ¶ 48 (emphasis added).

On January 23 and February 15, 2023, the Denver DA's office informed Dennis that a McAuliffe student ("Student A") had been charged with possession of an illegal firearm, attempted murder, robbery, and other firearm-related offenses. *Id.*, ¶¶ 49-50. Dennis did not feel it was safe for Student A to attend McAuliffe in person; he feared for the safety of "school administrators who

would be forced to conduct a daily pat-down" of Student A, as well as for that of other McAuliffe students, faculty, and staff. *Id.*, ¶¶ 52 & 54.

On February 27, 2023, Dennis "asked DPS to transfer" Student A "to an online educational program while the charges were pending." *Id.*, ¶ 56. DPS denied the request, "who claimed that despite the extremely violent act allegedly perpetrated by the student, because the alleged violent act did not occur on school grounds, the student should be permitted to remain physically in school." *Id.* On February 28, 2023, Dennis tried to initiate proceedings to expel Student A, but DPS denied the request for the same reasons. *Id.*, ¶ 57. Instead, DPS directed Dennis to permit the student to attend McAuliffe the next day, "with full implementation of a Safety Plan." *Id.* Over the next several weeks, DPS "guided the development of a Safety Plan for the student to attend classes on campus in person." *Id.*, ¶ 58. "Administrative staff members were required to search and pat-down" Student A "when they arrived at school in order to make sure that the student was not in possession of any weapons." *Id.* Student A wore "a visible ankle monitor as a condition of bond, alerting others that the student was facing criminal charges." *Id.*, ¶ 59. "The pat-down policy further singled out" Student A, as well as the fact that the student was being escorted at all times by a staff member throughout the school day as part of the Safety Plan." *Id.*

In the wake of a shooting at DPS' East High School occurring during a pat-down, Dennis "decided to speak to the press to publicly criticize DPS for its pat-down policy and refusal to remove" Student A. *Id.*, ¶ 65. On March 24, 2023, Dennis "spoke to a reporter … with 9News outside of school hours." *Id.*, ¶ 66. Dennis alleges that "he did so in his private capacity," but admits "he used his knowledge gained as principal of [McAuliffe] to inform the public of a matter than greatly impacted DPS students and families." *Id.* The story ran that evening. *Id.*

Dennis appeared on camera from his office at McAuliffe. *Id.* (URL printed in complaint, video at 3:13).[3] While "careful not to mention the student's name, age, gender, or any other personal identifying information in his interview," *Id.*, ¶ 67, Dennis spoke about the situation involving Student A at McAuliffe. Ex. B, Transcript of Video Interview.[4] Dennis had "provided the press with documents related to" Student A's charges that "were redacted to remove all personally identifying information," Complaint, ¶ 68, and a list of charges against Student A appeared on the video. *Id.* at ¶ 66 (URL printed in complaint, video at 1:48). As did an excerpt from a police report indicating that "the student should not return to a traditional setting." *Id.* (1:58). Dennis said, "The detective stated very clearly that under no circumstances did she believe that the student should be returning to an in-person learning setting in Denver Public Schools." *Id.* (URL printed in complaint, video at 2:01); Ex. B, 4:4-7. Dennis went on: "And yet we were directed to have the student return to school in person." Complaint, ¶ 66 (URL printed in complaint, video at 2:10); Ex. B, 4:9-10. After an "Administrative Transfer Request" document appeared on the screen, requesting transfer from McAuliffe to "Denver Online MS," Dennis said, "our request that the student be enrolled in an online school was denied." Complaint, ¶ 66 (URL printed in complaint, video at 2:15); Ex. B, 4:13-14. Dennis then agreed with the reporter's statement that "the school district told you that because this attempted murder took place off school grounds, it doesn't impact his life on school grounds." Complaint, ¶ 66 (URL printed in complaint, video at 2:28); Ex. B, 4:19-22. An excerpt of a recording of a conversation between Dennis and an unnamed

---

[3] This video is referenced in and central to Dennis' Complaint. *See Geras*, 638 F.3d at 1314-15.
[4] This is a transcript of the video interview that is referenced in and central to Dennis' Complaint. *See Geras*, 638 F.3d at 1314-15.

"district safety administrator" then played. Complaint, ¶ 66 (URL printed in complaint, video at 2:48).

"Approximately two weeks after Mr. Dennis spoke to the media, on April 7, 2023, DPS sent Mr. Dennis' supervisor [at NDIZ] a 'letter of concern' regarding 'her ability to effectively oversee" him. Complaint, ¶ 70. "The letter cited several investigations that DPS had conducted over the years based on occasional complaints from parents or staff." *Id.*, ¶ 71. On April 24, 2023, a DPS Director of Human Resources asked Dennis for an interview with the "stated purpose" of determining if "Board of Education policies had been violated" by Dennis. *Id.*, ¶ 74. Dennis participated in the interview. *Id.*

On July 3, 2023, DPS' Superintendent announced he was terminating Dennis. *Id.*, ¶ 80. Dennis received a termination letter that day. *Id.*, ¶ 75; Ex. C, Termination Letter.[5] "DPS failed to consult with … anyone … associated with the [NDIZ] before terminating" Dennis. Complaint, ¶ 79. Among many other reasons for the termination, the letter cited Dennis' participation in the 9News interview:

> On March 24, 2013, you took part in an interview with a reporter with channel 9News. The resulting 9News story highlights confidential documents to which you had access in your capacity as principal, including but not limited to a DPS administrative transfer form, a DPS threat assessment, and a juvenile justice charging document, pertaining to the same young student of color. Your public disclosure of confidential information allowed the reporter, the student's peers and the larger McAuliffe International community to ascertain that the information you provided to channel 9News was about him, causing the student to be singled out by faculty and staff and ostracized by his peers.

Ex. C, pp. 1-2.

---

[5] This document is referenced in and central to Dennis' Complaint. *See Geras*, 638 F.3d at 1314-15.

The letter also provided that "Pursuant to Superintendent Regulation GDQD-R, you have the right to request a Post-Termination Hearing before a Human Resources Department administrator." *Id.*, p. 2. That regulation provides for "extensive dismissal procedures" for "continuing service" employees like Dennis. Ex. D, Superintendent Regulation GDQD-R, p. 1.[6] It requires that a supervisor provide the employee "with written notice of the grounds for the dismissal and the employee may request a post-termination hearing before an administrator … in the Office of Talent." *Id.*, p. 2. "If the Office of Talent administrator affirms the dismissal, a continuing service employee may request a hearing before an impartial hearing officer." *Id.* That hearing is a full-blown evidentiary hearing where witness and exhibit lists must be exchanged in advance, the employee has the power to require production of "pertinent information not privileged under law," and the employee may be represented by legal counsel. *Id.*

On August 1, 2023, three members of DPS' Board of Education ("Board")—Vice President Anderson, Treasurer Esserman, and Secretary Quattlebaum—"held a public town hall meeting" to discuss Dennis' termination. Complaint, ¶ 82. That week, Vice President Anderson publicly claimed "he had received whistleblower reports that Mr. Dennis had improperly used a de-escalation room" at McAuliffe; he later stated that Dennis "only used the alleged 'seclusion room' for students of color." *Id.*, ¶¶ 83 & 97. DPS initiated an investigation of the issue. *Id.*, ¶ 88. Since then, "various DPS BOE members have made numerous public statements in their official capacities at press conferences, to the media, and on their official social media pages accusing Mr. Dennis of using this de-escalation room exclusively for students of color, along with numerous

---

[6] This document is referenced in and central to Dennis' Complaint. *See Geras*, 638 F.3d at 1314-15. It also is a matter of public record. *See Wvo-Ben*, 63 F.4th at 863.

accompanying accusations of racism and white supremacy." *Id.*, ¶ 89. On August 23, 2023, the Board "voted 6-1 in favor of terminating Mr. Dennis." *Id.*, ¶ 93.

"On August 28, 2023, DPS sent Mr. Dennis an updated termination letter adding the alleged policy violations concerning the de-escalation room as a reason for termination." *Id.*, ¶ 96; Ex. E.[7] On August 31, 2023, Director Anderson again told the public that Dennis only used the "seclusion room" for students of color. Complaint, ¶ 97.

## ARGUMENT

**A. Dennis' First Amendment Claims Must be Dismissed Because the Speech at Issue was not Protected.**

Dennis complains Defendants violated his First Amendment rights by terminating his employment for participating in a news interview in which he revealed educational information about a student at the school he led and security procedures in place there (the "Interview Speech"). Dennis' First Amendment claims fail because the Interview Speech was not protected. This is so because the conveyance of the information by Dennis through the Interview Speech violated the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g ("FERPA") and § 19-1-303(2)(a), C.R.S., and the First Amendment does not protect illegal speech. The Interview Speech was also unprotected because Dennis made it pursuant to his official duties, precluding it from protection by *Garcetti* and its progeny.

### 1.    The Interview Speech violated applicable law.

Some speech is categorically unprotected by the First Amendment. *E.g., Miller v. California*, 413 U.S. 15 (1973) (obscenity); *Chaplinski v. New Hampshire*, 315 U.S. 568 (1942)

---

[7] This document is referenced in and central to Dennis' Complaint. *See Geras*, 638 F.3d at 1314-15.

(fighting words). In the Tenth Circuit, that includes "speech … facilitating illegal activity." *Pleasant v. Lovell*, 876 F.2d 787, 790 (10th Cir. 1989) (speech aiding those seeking to evade taxes not protected). The First Amendment does not shield Dennis from discipline for engaging in speech that violated federal and state law.

FERPA is a federal law that prohibits the release of "education records (or personally identifiable information contained therein …) of students without the written consent of their parents to any individual, agency, or organization." 20 U.S.C. 1232g(b)(1). "Education records" include "those records, files, documents, and other materials which—(i) contain information directly related to a student; and (ii) are maintained by an educational agency or institution or by a person acting for such agency or institution." *Id.* at (a)(4). They include "student disciplinary records," *United States v. Miami Univ.*, 294 F.3d 797, 813 (6th Cir. 2022), and "juvenile [criminal] records," *Belander v. Nashua, New Hampshire, Sch. Dist.*, 856 F. Supp. 40, 50 (D.N.H. 1994). "Personally identifiable information" subject to FERPA includes "other information that, alone or in combination, is linked to a specific student that would allow a reasonable person in the school community, who does not have personal knowledge of the relevant circumstances, to identify the student with reasonable certainty." 34 C.F.R. § 99.3.[8]

Dennis' communications in the Interview Speech violated FERPA because he revealed Student A's educational records without alleging he had the written consent of Student A's parents. Dennis communicated Student A's juvenile criminal records, including a list of charges against Student A and an excerpt from a police report indicating that Student A "should not return to a

---

[8] The Secretary of Education may enforce FERPA's privacy protections by withholding future federal funding and seeking recovery of past funding from a school district. 20 U.S.C. § 1234c.

traditional setting." Complaint, ¶ 66 (URL printed in complaint, video at 1:58). Dennis likewise communicated Student A's disciplinary records: Dennis revealed that he had sought Student A's transfer to another school, and that District administrators had denied the request and directed that Student A return in person. All this information was directly related to Student A and maintained by the District or a person acting for it. It was inarguably subject to FERPA's written consent requirement. 20 U.S.C. 1232g(b)(1); *Miami Univ.*, 294 F.3d at 797; *Belander*, 856 F. Supp. at 50. Dennis does not allege he had such written consent.

Instead, he appears poised to argue that the Interview Speech did not violate FERPA because he was "careful not to mention the student's name, age, gender, or any other personal identifying information in his interview." Complaint, ¶ 67. While "de-identified education records and information from education records" may be disclosed without the required consent, this is only permitted after the disclosing party "has made a ***reasonable*** determination that a student's identity is not personally identifiable, whether through single or multiple releases, and taking into account other reasonably available information." *Id.* at § 99.31(b)(1) (emphasis added). No reasonable person would have reached that determination, and Dennis does not even try to plead around that standard. He admits that "students on Safety Plans that are subject to daily pat-downs"—like Student A—"are already known by most everyone at the school." Complaint, ¶ 48. Dennis even repeats himself for emphasis, alleging that, through no fault of his own, "the identity of these students is, and always has been, widely known by other students and faculty throughout the school." *Id.* He later alleges that Student A was conspicuous because he wore "a visible ankle monitor" and was "singled out" because he was "escorted at all times by a staff member throughout the school day." *Id.*, ¶ 59. Dennis therefore knew his allegedly "careful" de-identification effort

was not effective because the admissions within his Complaint signify that Student A's identity was "widely known" based on the information provided, notwithstanding omission of Student A's name.

Apart from the de-identification issue, Dennis may argue that what he revealed to the public about Student A was of no consequence because it was "widely known" that Student A was subject to pat-downs and to being escorted by staff. But Dennis revealed much more about Student A than that, communicating Student A's juvenile criminal record in the form of pending charges and police report excerpts and disciplinary information about recommendations for his placement. Dennis has not and could not reasonably allege that such information was known to the public and therefore exempt from FERPA's written consent requirements. *Cf. Frasca v. Andrews,* 463 F.Supp. 1043, 1050 (E.D.N.Y. 1979) (fact that student was kicked out of gym class in front of "two entire gym classes" not subject to FERPA written consent requirement).

In addition, Dennis' admitted provision of Student A's juvenile delinquency records to the press violated § 19-1-303(2)(a), which requires school personnel who obtain such records to "maintain the confidentiality" thereof. Redacting Student A's name from the records did not cure the violation.

Dennis violated state and federal law and endangered DPS' federal education funding by revealing the information communicated in the Interview Speech without the written consent of Student A's parents. That the speech itself was illegal forecloses it from First Amendment protection. *Pleasant*, 876 F.2d at 790; *see also Allmon v. Wiley*, 2011 WL 4501937, at *5 (D. Colo. Sept. 27, 2011) (unpublished), *aff'd*, 483 F. App'x 430 (10th Cir. 2012) (prisoner speech not protected because the speech itself "may violate a number of federal and state statutes").

2.    <u>The Interview Speech was made pursuant to Dennis' official duties.</u>

"When individuals enter into government employment or contracts, they accept certain restrictions on their freedom as part of the deal." *Fulton v. City of Philadelphia, Pennsylvania*, 141 S. Ct. 1868, 1878 (2021) (citing *Garcetti v. Ceballos*, 547 U.S. 410, 418-420 (2008)). "Public employees do 'not enjoy the same scope of First Amendment rights as a private citizen.'" *Cory v. City of Basehor*, 631 F. App'x 526, 528 (10th Cir. 2015) (quoting *Rock v. Levinski,* 791 F.3d 1215, 1219 (10th Cir. 2015)). "Because government employers, like private employers, need a significant degree of control over their employees' words and actions, not every restriction on a public employee's speech amounts to a deprivation of First Amendment rights." *Cory*, 631 F. App'x at 528 (quoting *Seifert v. Unified Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1151 (10th Cir. 2015)).

Whether a public employee's First Amendment rights have been violated is measured against the well-established, five-prong *Garcetti/Pickering* test: (1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct. *E.g.*, *Rock,* 791 F.3d at 1219.

"Whether speech relates to official duties is a legal inquiry for the court, not a factual question for the jury." *Trant v. Oklahoma*, 426 F. App'x. 653, 659 (10th Cir. 2010) (citing *Chavez–Rodriguez v. City of Santa Fe*, 596 F.3d 708, 713 (10th Cir. 2010)). The plaintiff carries the burden

to establish that the contested speech was not made pursuant to official duties. *Casey v. W. Las Vegas Ind. Sch. Dist.* 473 F.3d 1323, 1328 (10th Cir. 2007). "[S]peech that owes its existence to a public employee's professional responsibilities" falls within the employee's professional duties. *Garcetti*, 547 U.S. at 421-22. The Tenth Circuit has "taken a broad view of the meaning of speech that is pursuant to an employee's official duties." *Rohrbough v. Univ. of Colo. Hosp. Auth.*, 596 F.3d 741, 746 (10th Cir. 2010). Courts should take "a practical view of all the facts and circumstances surrounding the speech and the employment relationship, looking both to the content of the speech, as well as the employee's chosen audience, to determine whether the speech is made pursuant to an employee's official duties." *Id.*; *accord Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1204 (10th Cir. 2007). Speech "may be made pursuant to an employee's official duties even if it deals with activities that the employee is not expressly required to perform." *Id.* at 1203. "Speech is made pursuant to official duties if it is generally consistent with the type of activities an employee was paid to do." *Id.* at 1203.

To be sure, the District did not require Dennis to participate in the interview where he gave the Interview Speech. But *Brammer-Hoelter* teaches that this is by no means dispositive. *Id.* The fact is that speaking with the media about events and procedures at McAuliffe was consistent with the activities Dennis was expected to do as part of his employment. *See id.* One of his primary objectives as principal was to "communicate the [school's] vision, mission, and culture strategy to … external stakeholders." Ex. B, p. 1. He was responsible for "stakeholder relations" and one of the "essential functions" of his position is developing and managing the [school's] public relations programs, including community and district relations." *Id.*, pp. 2-3.

14

Dennis' own Complaint touts that he was widely celebrated as McAuliffe's school leader. Complaint, ¶ 44. He can hardly argue against the proposition that when he chose to speak to the press, "he would naturally be regarded as the public face of [McAuliffe] when speaking about matters involving [McAuliffe]." *See Foley v. Town of Randolph*, 598 F.3d 1, 7-8 (1st Cir. 2010) (referring to Fire Chief voluntarily speaking to press about matters involving the Fire Department). Dennis spoke to the media from his office at McAuliffe, "a forum to which he had access because of his position." *See id.* (for quoted text); *see also Heffernan v. Straub*, 612 F.Supp.2d 313, 326 (S.D.N.Y. 2009) (holding speech was made pursuant to lieutenant's official duty when "an ordinary citizen not employed by the Fire Bureau would not . . . have the opportunity to convey [his opinion] through the [department radio broadcast] channels that he utilized"), *reconsidered on other grounds*, 655 F.Supp.2d 378 (S.D.N.Y. 2009). By Dennis' own admission, he spoke using "his knowledge gained as principal of [McAuliffe] to inform the public." Complaint, ¶ 66; *see Williams v. Dallas Ind. Sch. Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) (employee's speech unprotected for reasons including that it reflected "special knowledge" he had gained as a result of his position). Indeed, Dennis was responsible for "[maintaining] and [directing] activities related to the District's safety and security efforts," and he as much admits that he engaged in the speech in question to achieve changes to the very security procedures the District was paying him to implement at McAuliffe.

Regardless of Dennis' conclusory allegation to the contrary, when Dennis spoke to the public regarding what was happening at McAuliffe, he spoke not as John Q. Public, but as DPS' official representative—the school principal and public face of McAuliffe. *See Foley*, 598 F.3d at 7-8 (citing *Tamayo v. Blagojevich*, 526 F.3d 1074, 1092 (7th Cir. 2008) for the proposition that "a

senior administrator of an agency was not speaking as a citizen when testifying before a legislative committee since she was testifying "because of the position she held within the agency" and was "not appearing as 'Jane Q. Public'"). As evidenced by Dennis' job description, the role of a school principal is paramount within its sphere; he was the highest authority inside McAuliffe. *Cf. Anderson v. Tupelo Reg'l Airport Auth.*, 967 F. Supp. 2d 1127, 1139 (N.D. Miss. 2013), *aff'd*, 568 F. App'x 287 (5th Cir. 2014), *as revised* (May 19, 2014) ("The court frankly doubts that plaintiff [Executive Director of Airport Authority] could have ever spoken as a private citizen to the media regarding the runway extension project. Indeed, it seems clear that [journalist] was interested in plaintiff's views on the subject precisely because he was Executive Director of the airport. Moreover, … it is clear that [Plaintiff had expertise on the subject] precisely because defendant had paid him to study it, on its behalf…. Under the facts of this case … plaintiff was speaking regarding a matter as to which he had expertise solely based upon his job duties….").

The Interview Speech cannot be divorced from Dennis' professional responsibilities. It owed its very existence to his role as school principal. Dennis spoke about school matters at McAuliffe of which he had knowledge strictly based on job duties DPS paid him to complete, did so from his office at McAuliffe, and did so pursuant to the public relations function of his job that included communications with the public about McAuliffe, not excepting those that touch upon fraught political issues involving school safety and security operations. Under these circumstances, "there is no relevant analogue to speech by citizens who are not government employees," and protecting the speech would result in "displacement of managerial discretion by judicial supervision." *Garcetti,* 547 U.S. at 423-44; *see also Brammer-Hoelter*, 492 F.3d at 1204 ("Speech is made pursuant to official duties if it is generally consistent with the type of activities an

16

employee was paid to do."). Accordingly, the Interview Speech was not protected by the First Amendment.

> 3.   <u>The individual defendants are entitled to qualified immunity from Dennis' First Amendment claims.</u>

"Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability from civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Irizarry v. City and Cnty. of Denver*, --- F. Supp. 3d ----, 2023 WL 2528782, *2 (D. Colo. 2023) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Thus, to survive a motion to dismiss under Rule 12(b)(6) where a qualified immunity defense is implicated, the plaintiff must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights." *Id.* (citing *Robbins v. Oklahoma ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1249 (10th Cir. 2008)). "When a defendant raises the defense of qualified immunity, a plaintiff carries a two-part burden to show: (1) that the defendant's actions violated a federal constitutional or statutory right, and, if so (2) that the right was clearly established at the time of the defendant's unlawful conduct." *Id.* (citing *T.D. v. Patton*, 868 F.3d 1209, 1220 (10th Cir. 2017)). "Courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).

Defendant DPS Board members Gaytán, Anderson, Esserman, Quattlebaum, Olson, and Lindsay and Superintendent Marrero—all sued in their individual capacities—each assert qualified immunity from Dennis' First Amendment claims. First, as argued above, there was no constitutional violation because the Interview Speech was not protected by the First Amendment.

Nor is the First Amendment right Dennis claims clearly established. "A right is clearly established when a Supreme Court or Tenth Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Truman v. Orem City*, 1 F.4th 1227, 1235 (10th Cir. 2021). While the facts of a prior case need not be "exactly parallel," it remains that "the contours of the right must be sufficiently clear so that a reasonable official would understand that what he is doing violates that right." *Id*. The Supreme Court has "repeatedly told lower courts not to define clearly established law at a high level of generality" because doing so "avoids the crucial question of whether the official acted reasonably in the particular circumstances that he or she faced." *Cummings v. Dean*, 913 F.3d 1227, 1239–40 (10th Cir. 2019) (brackets and internal quotation marks omitted). A plaintiff must demonstrate "a substantial correspondence between the conduct in question and prior law allegedly establishing that the defendant's actions were clearly prohibited." *Id.* at 1240.

There is no Supreme Court or Tenth Circuit decision that would have informed the individual defendants in this case that the First Amendment protects speech by a senior government administrator serving as the public face of that administrator's department, concerning events taking place in the department, and grounded solely in knowledge garnered from the administrator's job duties. Nor is there authority suggesting that speech could still be protected notwithstanding that the speech itself violated federal and state law. In fact, authority suggests the opposite is true on both counts. The individual defendants are entitled to qualified immunity as a result.

18

**B.  Dennis' Due Process Claims Must be Dismissed.**

 "The Fourteenth Amendment provides that no state may deprive a person of life, liberty, or property without due process of law." *McDonald v. Wise*, 769 F.3d 1202, 1210 (10th Cir. 2014) (citing U.S. Const. Amend. XIV, § 1). "Absent an emergency, an individual generally must be provided some kind of process before he is deprived of one of these protected interests." *Id.* Dennis asserts two due process claims in his third and fourth claims for relief, respectively citing infringement of his liberty and property interests. Both fail to state a claim to upon which relief can be granted.

1.    Dennis' liberty interest claim fails as a matter of law.

Dennis alleges Defendants infringed his liberty interest because he had no meaningful opportunity to clear his name after: certain Board members spoke about his termination and publicly disseminated his termination letter on August 1, 2023 (Complaint, ¶ 82); one Board member claimed he had improperly used a de-escalation room "in the first week of August 2023" (*id.,* ¶ 83); "various" Board members made public statements accusing Dennis of racism "since the first week of August" (*id.*, ¶ 89); and on August 31, one Board member had a press conference alleging Dennis only used the de-escalation room for students of color (*id.*, ¶ 97).

For Dennis to proceed on his liberty interest claim, he must allege facts sufficient to support that Defendants made statements that: (1) impugned his good name, reputation, honor, or integrity; (2) were false; (3) occurred in the course of terminating his employment and foreclosed other employment opportunities; and (4) were published. *Darr v. Town of Telluride*, 459 F.3d 1243, 1255 (10th Cir. 2007); *Sandoval v. City of Boulder*, 388 F.3d 1312, 1329 (10th Cir. 2004). If Dennis can prove all elements of his liberty interest claim, he must then show that he did not receive a name-

clearing hearing at which he was provided with the opportunity to refute the allegations against him. *McDonald,* 769 at 1213 (the remedy for a liberty interest infringement is a name-clearing hearing). Dennis' claim fails as to all Defendants because he was offered a name-clearing hearing.

A name-clearing hearing "gives the plaintiff an opportunity to hear and answer firsthand any stigmatizing charges, clearing his name of any false statements made about him, and curing the injury to his reputation." *Id.* Dennis was given this opportunity. The District issued Dennis termination letters explaining the reasons for his termination. Dennis was notified of his hearing rights under Superintendent Regulation GDQD-R, which provides employees like Dennis with extensive procedures to contest a dismissal or recommendation, including participation in a hearing with a Human Resources administrator in the Office of Talent. Ex. D. If the administrator in the Office of Talent upholds the termination recommendation, then the employee is entitled to a full evidentiary hearing before a neutral hearing officer at which the employee could be represented by counsel. *Id.,* p. 2. Dennis does not allege he participated in the GDQD-R hearing process. Had he done so, he would have been able to present evidence and witnesses at an internal hearing, as well as at a hearing before a neutral hearing officer with representation by counsel. That hearing process would have afforded Dennis sufficient opportunity to clear his name of any stigmatizing statements by obtaining a decision absolving him of wrongdoing that could have been used to cure whatever injury he claims to have suffered as a result of the statements made about him. Because Dennis was offered a name-clearing hearing, his liberty interest claim fails.

2.     <u>Dennis' property interest claim fails as a matter of law.</u>

a.     Dennis had no property interest in his continued employment.

"Property interests are created and defined by 'existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.'" *McDonald*, 769 F.3d at 1210 (citing *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)). "A public employee has a property interest in his continued employment where 'state or local law creates a sufficient expectancy of continued employment.'" *McDonald*, 769 F.3d at 1210 (citing *Driggins v. City Okla. City, Okla.*, 954 F.2d 1511, 1513 (10th Cir. 1992)). "State law determines whether a claim of entitlement to employment is sufficient." *Id.*

In Colorado, "[t]raditionally, 'local government employees hold their posts at the pleasure of the proper local government authorities and can be dismissed without cause, in the absence of restrictions or limitations provided by law." *McDonald*, 769 F.3d at 1210 (citing *Fremont RE-1 Sch. Dist. v. Jacobs*, 737 P.2d 816, 820 (Colo. 1987)). "[A] property interest does not arise from a 'mere unilateral expectation' or an 'abstract need.'" *Johnson v. Sch. Dist. No. 1 in the Cnty. of Denver*, 413 P.3d 711, 718 (Colo. 2018) (quoting *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980)). "But a legitimate expectation of continued employment may exist where, for example, an employee has tenure, a contract for a fixed term, an implied promise of continued employment, or if state law allows dismissal only for cause or its equivalent." *McDonald*, 769 F.3d at 1210-11 (citing *Darr*, 495 F.3d at 1251).

Dennis points to no legal "tenure" or contract between him and DPS in asserting he had a property interest. Instead, he refers to the contract between DPS and NDIZ, citing to the provision

precluding DPS from taking action without seeking the approval of NDIZ, and urging that DPS violated his right to due process by "[skipping that step] in the termination process." Complaint, ¶¶ 79 & 159-61. This theory is at odds with other allegations in the Complaint. Dennis alleges that the contract between DPS and NDIZ provided that "if the parties fail to agree" on removing the school leader, "either party may bring the dispute to the DPS Board of Education." Complaint, ¶ 79. Dennis alleges that NDIZ and DPS did not agree to remove him, but the issue of his removal was inarguably brought to the Board by DPS. *Id.*, ¶¶ 79 and 93.

Dennis' theory is also legally flawed. He confuses the grant of procedure with the provision of a property interest. "The categories of substance and procedure are distinct…. 'Property cannot be defined by the procedures provided for its deprivation any more than can life or liberty." *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994) (citing *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985)); *accord Johnson*, 413 P.3d at 718 (rejecting continuation of property interest based on statutory procedures after legislature removed substantive "entitlement and durational language"). A provision in a contract to which Dennis is not even a party requiring DPS to consult with NDIZ before removing him from McAuliffe before ultimately bringing the matter to the Board is not a promise of continued employment. *See McDonald*, 769 F.3d at 1210 (describing how "legitimate expectations of continued employment" are created).

          b.     In any event, Dennis had what amounts to a pre-termination hearing and was offered a post-termination hearing.

Even if Dennis had a protected property interest in his employment, he had or was offered adequate process. "As a general rule, the Due Process Clause requires 'some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment." *Montgomery v. City of Ardmore*, 365 F.3d 926, 935 (10th Cir. 2004) (citing

*Loudermill*, 470 U.S. at 542). A pre-termination hearing "need not be elaborate." *Id.* at 935-36. It requires "(1) oral or written notice to the employee of the charges against him; (2) an explanation of employer's evidence and (3) an opportunity for the employee to present his side of the story." *Id.* at 936. The Tenth Circuit has upheld "informal proceedings, such as pretermination warnings and an opportunity for a face-to-face meeting with supervisors, and even a limited conversation between an employee and his supervisor immediately prior to the employee's termination." *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009) (internal citations omitted). In addition, a "full post-termination hearing is required." *Tonkovich v. Bd. of Regents*, 159 F.3d 504, 517 (10th Cir. 1998). This is "understood to include the right to representation by an attorney and the right to cross-examine adverse witnesses." *Id.*

Dennis' April 24, 2023 meeting with the DPS Director of Human Resources to respond to allegations of DPS Board Policy violations met due process requirements for a pre-termination hearing. *See Riggins*, 572 F.3d at 1108. And DPS' offer of a post-termination hearing before an impartial hearing officer at which Dennis could engage in limited discovery, confront witnesses, and be represented by legal counsel afforded him the opportunity for sufficient post-termination process. *See Tonkovich*, 159 F.3d at 517. It is well established that knowingly failing to take advantage of state law procedures waives the right to challenge them in federal court. *Pitts v. Bd. of Educ. of U.S.D. 305*, 869 F.2d 555, 557 (10th Cir. 1989) (citing cases); *accord Sandoval v. City of Boulder*, 388 F.3d 1312, 1329 (10th Cir. 2004) ("Sandoval has waived any argument that she was denied due process by failing to request the hearing to which she now claims she was entitled."); *McGee v. Boren*, 58 F. App'x 436, 438 (10th Cir. 2003) ("By failing to attend the hearing, Dr. McGee "gave up his right to test the correctness of the [University's] decision.").

3.    The individual defendants are entitled to qualified immunity from Dennis' due process claims.

Defendant DPS Board members Gaytán, Anderson, Esserman, Quattlebaum, Olson, and Lindsay and Superintendent Marrero also assert qualified immunity from Dennis' due process claims. As an initial matter, they claim immunity because there was no constitutional violation for the reasons stated immediately above, nor is there clearly established authority to the contrary.

But there are additional reasons that the due process claims fail against the individual defendants. To support a viable § 1983 claim, a plaintiff "must establish that each defendant— whether by direct participation or by virtue of a policy over which he possessed supervisory responsibility—caused a violation of plaintiff's clearly established constitutional rights, and that each defendant acted with the constitutionally requisite state of mind." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013). This must be done by more than pleading defendants, who, as a collective and undifferentiated whole, were responsible for those violations. *See id*. Rather, the complaint must identify "specific actions taken by particular defendants, or specific policies over which particular defendants possessed supervisory responsibility, that violated a plaintiff's clearly established constitutional rights." *Id*.

Due process claims against individuals who lack authority to offer proper process are subject to dismissal. *See McDonald*, 769 F.3d at 1214-15 ("The depriving governmental entity is generally responsible for the provision of due process"; and a person "in no position" to provide the employee with the process due is entitled to qualified immunity). Dennis makes no plausible allegations that any named individual Board member could grant him process associated with either his liberty or property interest claims, presenting an additional reason to grant them qualified immunity on the due process claims.

As for the liberty interest claim, there are no allegations whatsoever that Board members Lindsay or Olson or Superintendent Marrero made any stigmatizing public statements about Dennis that could support personal liability. And Board member Gaytán is only alleged to have said that Dennis used the de-escalation room as an "incarceration room." Complaint, ¶ 88. "Incarcerate" means to "subject to confinement." *See* https://www.merriam-webster.com/dictionary/incarcerate. A statement must be false to be actionable, *Darr*, 459 F.3d at 1255, and Dennis admits he confined students to the de-escalation room and prohibited them from leaving by holding the door closed, and at one point installed a lock. Complaint, ¶¶ 85-86. Dennis has not plausibly alleged that Gaytán publicly made any false statement about him. These are additional reasons to grant Board members Gaytán, Olson, and Lindsay and Superintendent Marrero qualified immunity from Dennis' due process liberty interest claim.

## CONCLUSION

For the reasons stated above, Dennis' Complaint should be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

RESPECTFULLY SUBMITTED this 7th day of November, 2023.

SEMPLE, FARRINGTON, EVERALL & CASE, P.C.

By: *s/ Michael Brent Case*
Michael Brent Case
Jonathan P. Fero
1120 Lincoln Street, Suite 1308
Denver, CO 80203
(303) 595-0941
bcase@semplelaw.com
jfero@semplelaw.com

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 7th day of November, 2023, a correct copy of the foregoing with exhibits was filed and served via CM/ECF to the following:

David A. Lane
Madison Lips
K<small>ILLMER</small> L<small>ANE</small>, LLP
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
dlane@kln-law.com
mlips@kln-law.com
*Attorneys for Plaintiff*

By: *s/ Kathleen Schmidt*

## <u>INDEX OF EXHIBITS TO DEFENDANTS' MOTION TO DISMISS</u>

1. Exhibit A – Executive Principal Job Description

2. Exhibit B – Transcript of Video Interview

3. Exhibit C – Termination Letter dated July 3, 2023

4. Exhibit D – Superintendent Regulation GDQD-R

5. Exhibit E – Updated Termination Letter dated August 28, 2023