**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 23-cv-02257-JLK

KURT DENNIS,

Plaintiff,

v.

SCHOOL DISTRICT NO. 1 d/b/a DENVER PUBLIC SCHOOLS;
SUPERINTENDENT ALEX MARRERO, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION PRESIDENT XÓCHITL GAYTÁN, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION VICE PRESIDENT AUON'TAI ANDERSON, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION TREASURER SCOTT ESSERMAN, in his individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION SECRETARY MICHELLE QUATTLEBAUM, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION PRESIDENT XOCHITL GAYTAN, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION MEMBER CARRIE OLSON, in her individual and official capacities;
DENVER PUBLIC SCHOOL BOARD OF EDUCATION MEMBER CHARMAINE LINDSAY, in her individual and official capacities,

Defendants.

---

**RESPONSE TO DEFENDANTS' MOTION TO DISMISS [Doc. 11]**

---

## I. INTRODUCTION

After a violent student shot two school administrators at East High School while they conducted a pat-down search of his person, Kurt Dennis had the courage to alert the public that administrators throughout Denver Public Schools (DPS) were being forced to conduct these

dangerous pat-downs without adequate training. In retaliation for his interview with media in which he was critical of DPS's failures, he was wrongfully terminated from his position as Principal of McAuliffe International School by the Defendants. Mr. Dennis filed this lawsuit to vindicate his rights under the First and Fourteenth Amendments of the United States Constitution.

Mr. Dennis' speech did not violate any laws and was not made pursuant to his official duties – it is therefore protected by the First Amendment. Mr. Dennis was deprived of his due process liberty interest in his good name and reputation because the hearing he was offered was not sufficiently public to constitute a "name-clearing hearing," and was not before an actual decision-maker. Mr. Dennis was further deprived of his due process interest in continued employment, which was established by the terms of his employment. Finally, none of the individual defendants have qualified immunity for the constitutional violations they committed.

## II. STANDARD OF REVIEW

To state a claim under Fed. R. Civ. P. 8(a), "a complaint must contain enough allegations of fact, taken as true, to state a claim to relief that is plausible on its face." *Khalik v. United Air Lines*, 671 F.3d 1188, 1190-91 (10th Cir. 2012) (citation omitted). Plausible does not mean likely to be true. *Robbins v. Okla ex rel. Dep't of Human Servs.*, 519 F.3d 1242, 1247 (10th Cir. 2008). Rather, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). Specific facts are not necessary to state a claim for relief; the plaintiff "need only give the defendant fair notice of what the…claim is and the grounds upon which it rests." *Khalik*, 671 F.3d at 1191. Plaintiff is not required to set forth "a

prima facie case for each element" of the claim to survive a motion to dismiss. *Sylvia v. Wisler,* 875 F.3d 1307, 1326 (10th Cir. 2017) (citation omitted).

In reviewing a motion to dismiss, the court must accept as true all the well-pleaded factual allegations in the Complaint and draw all reasonable inferences therefrom in the light most favorable to the plaintiff. *Dias v. City & Cty. of Denver*, 567 F.3d 1169, 1178 (10th Cir. 2009) (citation omitted). The court then must determine whether, viewing the allegations in the light most favorable to the plaintiff, the plaintiff has pleaded a plausible entitlement to relief. *Iqbal*, 556 U.S. at 679. "There is a strong presumption against dismissal for failure to state a claim." *Shell v. Am. Fam. Rights Ass'n*, 899 F.Supp.2d 1035, 1055 (D. Colo. 2012).

When ruling on a motion under Fed. R. Civ. P. 12(b)(6), a court may not look beyond the contents of the complaint itself. *MacArthur v. San Juan County*, 309 F.3d 1216, 1221 (10th Cir. 2002). "[I]f matters outside of the complaint are presented to and not excluded by the court, then the court should treat the motion as one for summary judgment under Rule 56 and not a motion to dismiss." *Jackson v. Integra, Inc.*, 952 F.2d 1260, 1261 (10th Cir. 1991); *see also Prager v. LaFaver*, 180 F.3d 1185, 1188 (10th Cir. 1999).[1] Alternatively, rather than converting the motion to dismiss into a motion for summary judgment—especially because the plaintiff has not had a chance to conduct any discovery—a district court has discretion to decide the motion under Rule 12(b)(6) without considering the attached materials. *See Prager*, 180 F.3d at 1188. Otherwise, a court reviewing a motion to dismiss may consider evidence attached to, or incorporated within, the motion without converting the motion one for summary judgment only in three "quite limited" circumstances: (1) the document is attached to, or incorporated by reference into, the

---

[1] If this Court were to consider Defendants' exhibits and necessarily convert this motion to a motion for summary judgment, Plaintiff's response would require substantial discovery, including depositions, to which Plaintiff would be entitled under Fed. R. Civ. P. 56(d).

complaint; (2) the document constitutes a "matter[] of which [the] court may take judicial notice"; or (3) the "document[] [is] referred to in the complaint, …[is] central to the plaintiff's claim and the parties do not dispute the document's authenticity." *Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010) (citation omitted). However, evidence that the court takes judicial notice of "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264, n.24 (10th Cir. 2006) (quoting *Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir.2002)).

A. **Defendants' exhibits should be disregarded when ruling on the Motion to Dismiss.**

As an initial matter, Defendants have sought to include five exhibits that constitute evidence outside the four corners of the Complaint. None of the three "quite limited" circumstances is present here justifying introduction of the defense exhibits. *Gee*, 627 F.3d at 1186. First, Plaintiff's Complaint does not incorporate by reference the documents attached by Defendants, or Defendants' characterization of them. *Goldman v. Belden*, 754 F.2d 1059, 1066 (2d Cir. 1985) (holding that even "limited quotation [of a document in a complaint] does not constitute incorporation by reference."). Courts have held that even "quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004). The Complaint includes no quotation of the documents that Defendants attach and there is only some reference to parts of them.

Second, the attachments do not constitute matters of which the Court may take judicial notice. "[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment." *Tal*, 453 F.3d at 1264 n.24. The court may "take judicial notice of its own files and records, as well as facts which are a

4

matter of public record." *Id.* (citation omitted). "[I]n order to preserve a party's right to a fair hearing, a court, on a motion to dismiss, must only take judicial notice of facts which are not subject to reasonable dispute." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). "Judicial notice is proper when a fact is beyond debate, for instance, what time the sun sets on a given day." *Estate of Lockett v. Fallin*, 841 F.3d 1098, 1111 (10th Cir. 2016). On the other hand, when a fact contained in a public record is subject to dispute, judicial notice is inappropriate "because there is no way for an opposing party, prior to the issuance of the court's decision, to register his or her disagreement with the facts in the document of which the court was taking notice." *Passa*, 123 F. App'x at 697. Courts "do not accept the facts set forth in the public record as true." *Eden v. Voss*, 105 F. App'x 234, 239 (10th Cir. 2004). It is up to the factfinder to sift through the pieces of evidence that Defendants attached and determine their importance; it is not the province of the Court on a Rule 12(b)(6) motion.

Third, the documents attached by Defendants are not "central" to the Complaint. *See, e.g., Gee*, 627 F.3d at 1186. Although the Tenth Circuit has not defined the term "central to the plaintiff's claim," other circuits which apply the same standard have made clear that the court may only consider a document attached to a motion to dismiss if the document is "integral to the complaint." *San Leandro Emer. Med. Grp. Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 808 (2d Cir. 1996) (citation omitted); *accord Brann v. Daddi*, No. 05-cv-00023-WYD-CBS, 2005 U.S. Dist. LEXIS 43373, at *8 n.3 (D. Colo. Aug. 22, 2005) (citing *id.*). A document is integral to the complaint when "the complaint relies heavily upon its terms and effect"; indeed, "a plaintiff's reliance on the terms and effect of a document in drafting the complaint is a necessary perquisite to the court's consideration of the document on a dismissal motion." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (citation omitted) (emphasis in

original). Thus, a court may only "consider an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993). The documents attached by Defendants are not central to Plaintiff's claims; they are merely some of the evidence of Defendants' policies and actions taken against Mr. Dennis, which will need to be refuted by Plaintiff, and then sifted and evaluated by the factfinder. Ultimately, as another court in this circuit thoughtfully explained, "[o]n a motion to dismiss, the court cannot compare the evidence that will govern the case at trial or even judge the motion by the summary judgment facts. The court cannot evaluate competing evidence to discern whether a genuine factual issue exists. Instead, the court must accept the facts pleaded by the non-moving party and draw any reasonable inferences in that party's favor." *McHenry v. City of Ottawa*, No. 16-2736-DDC-JPO, 2017 U.S. Dist. LEXIS 157369, at *11-12 (D. Kan. Sep. 26, 2017). This Court should not consider the extraneous evidence attached and referenced by Defendants.

### III. Factual Background

Mr. Dennis was the Principal at McAuliffe International School ("McAuliffe") in Denver from 2011 to 2023 and was consistently rated one of the highest performing principals in the DPS system throughout that time. [ECF No. 1] ("Complaint"), ¶¶ 31, 44. Sometime before 2023, Defendants instituted a policy requiring school administrators to conduct "pat-downs" of students on "Safety Plans." These safety plans often involved students who were facing criminal charges for violent acts, and the purpose of the "pat-downs" was to search for weapons or contraband on students who were deemed to pose a dangerous safety risk. *Id.*, ¶ 46. Defendants provided no training to administrators on how to do this safely. *Id.*, ¶¶ 45-46. One student at McAuliffe was put on a Safety Plan involving daily pat-downs in March 2023 after the Denver

District Attorney's office alerted Mr. Dennis that the student had been charged with several dangerous crimes, including attempted murder, robbery, and firearm-related offenses. *Id*., ¶¶ 49-50, 57. Mr. Dennis, following state law governing such situations, initiated proceedings to either expel or move the student to online learning, but these lawful requests were denied by DPS. *Id*., ¶¶ 56-57.

After two administrators at East High School in Denver were shot by a student during the very same pat-down procedure ordered by Defendants, Mr. Dennis felt that the Denver community urgently needed to know the extent to which Defendants were putting students and staff in danger on a daily basis through its Safety Plan policies. *Id*., ¶¶ 61-65. Mr. Dennis spoke to 9News in his private capacity, after school hours, and he carefully redacted any and all personal identifying information from all information he gave to the press about the student. *Id*., ¶¶ 66-68.[2] In response to Mr. Dennis's free speech to the press on a matter of public concern, two weeks after the interview, Defendants retaliated against Mr. Dennis by initiating termination proceedings. *Id*., ¶ 70. In the process, Defendants failed to consult the Northeast Denver Innovation Zone (NDIZ)[3], which had a contract with DPS that gave NDIZ autonomous input on Mr. Dennis's employment status. *Id*.

As Mr. Dennis's termination became public, Defendants faced an outpouring of shock and anger from McAuliffe parents, students, and staff who demanded reinstatement of their principal. *Id*., ¶ 78. In response, Defendants piled on additional accusations against Mr. Dennis

---

[2] The 9News interview can be found here (URL linked in Complaint): https://www.9news.com/article/news/investigations/dps-denver-student-accused-attemptedmurder-placed-middle-school-despite-fears-principal-denver-police/73-a71dd1c5-8307-4ef1-b5b6-b5b6-b0799d5ad992

[3] NDIZ is a nonprofit organization that works in partnership with DPS to promote further autonomy and innovative thinking in schools. McAuliffe International formed a partnership with NDIZ in 2016 under Mr. Dennis's leadership. *Id*., ¶ 35.

of racism and white supremacy in connection with the use of a de-escalation room at McAuliffe,[4] which Board Members claimed was *only* used for students of color. *Id.*, ⁋⁋ 83-89. These attacks on Mr. Dennis's character and integrity were demonstrably false, and impugned his good name and reputation. *Id.*, ⁋⁋ 142-143. Mr. Dennis was never given an opportunity to clear his name at a public hearing before an actual decisionmaker. *Id.*, ⁋ 92. As a result, Mr. Dennis has been unable to find comparable work as a principal. *Id.*, ⁋ 91. On August 24, 2023, six of the seven Board Members voted in favor of terminating Mr. Dennis, thereby finalizing the unlawful retaliation in violation of Mr. Dennis's First and Fourteenth Amendment rights. *Id.*, ⁋ 93.

## IV.  ARGUMENT

### A.  Mr. Dennis has adequately pleaded that Defendants retaliated against him in violation of his First Amendment rights.

Mr. Dennis has sufficiently pleaded both that (1) Defendants violated his constitutional rights, and (2) such rights, and the violations thereof, were clearly established at the time of the alleged conduct. *See Puller v. Baca*, 781 F.3d 1190, 1196 (10th Cir. 2015).

### 1.  Defendants violated Mr. Dennis' First Amendment rights.

"A government employer may not, as a condition of employment, compel an employee to relinquish carte blanche his First Amendment right to comment on matters of public concern." *Maestas v. Segura*, 416 F.3d 1182, 1187 (10th Cir. 2005). "First Amendment claims are considered 'against the background of a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public

---

[4] The de-escalation room in question was used for students under certain agreed-upon circumstances when a student was escalated, typically as part of an Individualized Education Plan (IEP). *Id.*, ⁋⁋ 83, 142. DPS policies permit the use of de-escalation rooms that are monitored by staff. *Id.*, ⁋ 83. Defendants claimed that Mr. Dennis locked students alone in the room against DPS policy, though there was no DPS policy on point for how to safely monitor violently escalated students from inside the room. *Id.*, ⁋ 84.

officials.'" *Pryor v. Sch. Dist. No. 1*, No. 1:22-cv-02886-JLK, 2022 U.S. Dist. LEXIS 235189, at

*30 (D. Colo. Dec. 23, 2022) (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964)).

To state a claim for a First Amendment free speech retaliation violation in the public

employment context, courts **balance** the following factors:

> (1) whether the speech was made pursuant to an employee's official duties;
> (2) whether the speech was on a matter of public concern; (3) whether the
> government's interests, as an employer, in promoting the efficiency of the public
> service are sufficient to outweigh the plaintiff's free speech interests; (4) whether
> the speech was a motivating factor in the adverse employment action; and
> (5) whether the defendant would have reached the same employment decision in
> the absence of the protected conduct.

*Eisenhour v. Weber County*, 744 F.3d 1220, 1227-28 (10th Cir. 2014). "[T]he last two [elements]

are factual issues typically decided by the jury." *Knopf v. Williams*, 884 F.3d 939, 945 (10th Cir.

2018). Defendants claim that Plaintiff's speech was not protected by the First Amendment

because it was prohibited under the Family Educational Rights and Privacy Act, 20 U.S.C. §

1232g ("FERPA") and § 19-1-303(2)(a), C.R.S. Defendants also claim that the speech is not

protected because it was made pursuant to Plaintiff's official duties (the first prong of the five-

factor test above). However, as is explained in detail below, Mr. Dennis's speech was lawful

under federal and state law, was made on a matter of urgent public concern and in his capacity as

a private citizen, and was therefore protected by the First Amendment. *See Van Deelen v.*

*Johnson*, 497 F.3d 1151, 1156 (10th Cir. 2007) (holding that the *Garcetti/Pickering* analysis

"was meant to form a sphere of protected activity for public employees, not a constraining noose

around the speech of private citizens.").

### a. Mr. Dennis' speech was lawful under FERPA.

At this stage of the litigation, this Court must simply stay within the four corners of the

Complaint. *MacArthur*, 309 F.3d at 1221. Defendant may invoke numerous defenses in a motion

for summary judgment, but whether FERPA was or was not violated is a fact-based issue which is inappropriately raised in defendants' motion pursuant to F.R.C.P 12(b)(6). Despite this, Plaintiff responds to Defendants' argument in the Motion to Dismiss by noting that FERPA was not violated.

FERPA is a federal statute governing the privacy of student records. The statute specifically restricts disclosure of "education records" which are defined as "records, files, documents, and other materials" that "contain information directly related to a student" and are "maintained by an education agency or institution." 20 U.S.C. § 1232g(a)(4). "Disclosure means to permit access to or release, transfer, or other communication of personally identifiable information contained in education records by any means including oral, written, or electronic means, to any party except the party identified or the party that provided or created the record." 34 C.F.R. § 99.3. "Personally identifiable information" is defined to include, among other things, the student's name, address, social security number, or "[o]ther information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, *who does not have personal knowledge of the relevant circumstances,* to identify the student with reasonable certainty." 34 C.F.R. § 99.3 (emphasis added). An education document that has been redacted to remove personally identifiable information is not subject to restrictions under FERPA. 34 C.F.R. § 99.31(b)(1); s*ee also Doe v. Baylor Univ.*, No. 6:16-CV-173-RP, 2018 U.S. Dist. LEXIS 248764, at *16 (W.D. Tex. May 6, 2018) ("Student records produced by Baylor are subject to the provisions of FERPA only insofar as they contain 'personally identifiable information.'").

Mr. Dennis provided the press with documents that "were redacted to remove all personally identifying information about the student." Complaint, ⁋ 68. He further made

statements about the student's ("Student A," as labeled by Defendants) criminal history without revealing any of the student's personally identifying information – not Student A's name, age, gender, or any other identifying characteristics. Complaint, ¶ 67. Defendants point out that other students in the school had *personal knowledge* of Student A's identity as alleged in the Complaint, and therefore Mr. Dennis could not make a "reasonable determination that a student's identity is not personally identifiable." Motion to Dismiss, p. 11, citing 34 C.F.R. § 99.31(b)(1). As support, Defendants point to facts in the Complaint that Student A had "a visible ankle monitor" and was "singled out" because Student A was "escorted at all times by a staff member throughout the school day." Motion to Dismiss, p. 11, citing Complaint, ¶ 11.

However, people in the school community with knowledge of Student A's ankle monitor and constant supervision necessarily had "*personal knowledge* of the relevant circumstances" surrounding Student A. 34 C.F.R. § 99.3 (emphasis added). As the regulations make clear, "personally identifying information" protected by FERPA *only* includes "[o]ther information that, alone or in combination, is linked or linkable to a specific student that would allow a reasonable person in the school community, *who does not have personal knowledge of the relevant circumstances*, to identify the student with reasonable certainty." *Id*. (emphasis added). A person in the school community who had never seen or heard of Student A on campus would have no way of identifying Student A from the carefully redacted information provided by Mr. Dennis, and therefore the redactions were sufficient to satisfy FERPA under 34 C.F.R. § 99.3 and 34 CFR § 99.31(b)(1).

Furthermore, FERPA permits school officials to disclose education records without parental consent "to protect the health and safety of the student or other persons" when it is "in connection with an emergency." 20 U.S.C. § 1232g(b)(1)(I); 34 C.F.R. § 99.36. Though this

exception was once required to be narrowly tailored, the Department of Education issued new rules in the wake of the Virginia Tech shooting "to eliminate[ ] the previous requirement that [the emergency exception] be 'strictly construed'" in favor of a highly flexible and deferential standard. Family Educational Rights and Privacy, 73 Fed. Reg. at 74,837. The amendment recognized that school officials must "act quickly and decisively when emergencies arise" and therefore "provides greater flexibility and deference to school administrators." *Id.* The Department of Education is the only entity with authority to enforce FERPA by withholding funds from education institutions, and enforcement proceedings are reserved for educational institutions with a "policy or practice" of disclosing information without consent. 20 U.S.C. § 1232g(a)(1)(b)). There is no private right of action under the statute, and the statute is not enforced against individual school administrators like Mr. Dennis. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 287 (2002).

Current regulations provide that a school official "may take into account the totality of the circumstances pertaining to a threat to the health or safety of a student or other individuals," and if it is determined that "there is an articulable and significant threat to the health or safety of a student or other individuals," education records may be disclosed as necessary. 34 C.F.R. § 99.36(c). Importantly, the regulations specifically state that "[i]f, based on the information available at the time of the determination, there is a *rational basis* for the determination, the Department [of Education] will not substitute its judgment." *Id.* (emphasis added).

In the wake of the shooting at East High School, Mr. Dennis truly believed that his school faced a substantial threat of a similar life-threatening emergency. Complaint, ⁋ 64. The student in question had allegedly attempted to rob a liquor store and shot the clerk in the process. Finding no recourse through administrative channels at DPS, he believed that disclosure to the

press was necessary under "the totality of the circumstances" to prevent "an articulable and significant threat to the health or safety of a student or other individuals." *Id.* This constitutes "a rational basis for the determination" to disclose education records (though, again, they were not restricted by FERPA due to redaction), and the Department of Education would have no power to substitute its judgment for Mr. Dennis' in an enforcement action. A single instance of a good-faith disclosure would also not prompt enforcement as this would not constitute the school's "policy or practice" of disclosing information without consent. 20 U.S.C. § 1232g(a)(1)(b)). Therefore, even if this Court finds in a properly filed summary judgment motion, that the information Mr. Dennis provided to the press was not sufficiently redacted and therefore protected by FERPA, his actions fall under the extremely deferential health and safety emergency exception. This was not illegal speech under FERPA, and therefore is protected by the First Amendment.

### b. Mr. Dennis' speech was lawful under § 19-1-303(2)(a), C.R.S.

Defendants again improperly ask this Court to look outside the four corners of the Complaint in its argument that Mr. Dennis's speech violated state law. *MacArthur*, 309 F.3d at 1221. Despite this, Plaintiff responds to Defendants' argument in the Motion to Dismiss by noting that CRS § 19-1-303(2)(a) was not violated.

Defendants claim that Mr. Dennis violated CRS § 19-1-303(2)(a), which requires school personnel to "maintain the confidentiality" of juvenile delinquency records. Defendants state with no support that "[r]edacting Student A's name from the records did not cure the violation." Motion to Dismiss, p. 12. However, disclosure of a list of charges unattached to any personally identifying information constitutes maintaining the confidentiality of the records under both the plain meaning of the term "confidentiality" and under the legal meaning of confidentiality in the

context of student records (see discussion of FERPA redactions above). Furthermore, C.R.S. § 19-1-304 clarifies that when a juvenile is charged with a "crime of violence" (which includes attempted murder) or a firearm-related offense, the public shall have access to the relevant "arrest and criminal records information" concerning the juvenile. §19-1-304(1)(b.5)(2)(B); §19-1-304(5). The statute further clarifies that "information made available to the school district and *not otherwise available to the public* shall remain confidential." §19-1-304(1)(b.5)(2)(B); §19-1-304(5) (emphasis added).

Since §19-1-304 requires that arrest and criminal records relating to juveniles charged with crimes of violence and firearm-related offenses are made publicly available, the information about Student A in this case is not mandatorily confidential under this statute. However, in the interest of preserving Student A's privacy, Mr. Dennis redacted all personally identifying information, thereby maintaining the confidentiality of the records. Therefore, Mr. Dennis' speech was not illegal under Colorado law and is therefore protected by the First Amendment.

### c.  Mr. Dennis' speech was not made pursuant to official duties.

Defendants claim that Mr. Dennis's speech was not protected by the First Amendment because his speech was made pursuant to his official duties as Principal. Motion to Dismiss, p. 13. While Mr. Dennis learned about DPS's dangerous pat-down policy while doing his job as a public employee, his *act of speaking* about his safety concerns to the press outside of school hours in his private capacity was not pursuant to his official duties. Complaint, ⁋ 66. On this point, Defendants again attempt to circumvent the procedural safeguards of Fed. R. Civ. P. 12(b)(6) by improperly asking the Court to evaluate evidence rather than assuming the truth of Plaintiff's well-pled allegations, as it is required to do. *See* Defense Exhibits A-E. Defense Exhibit A (cited in the Motion to Dismiss as Exhibit B, but apparently referring to Exhibit A as filed), is a document created by Denver Public Schools that lists the generic job duties for the

position of Executive Principal, and Defendants improperly seek to use it as evidence of Mr. Dennis's job duties. This is evidence outside the four corners of the Complaint and should be disregarded.

However, in an abundance of caution, Defendants' arguments based on those exhibits will be addressed here. "The mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee—rather than citizen—speech. The critical question under *Garcetti* is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, 573 U.S. 228, 240 (2014) (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Indeed, "[m]erely because an employee's speech was made *at* work and *about* work does not necessarily remove that employee's speech from the ambit of constitutional protection. Rather, it is whether the speech was made pursuant to the employee's job duties or, in other words, whether the speech was 'commissioned' by the employer." *Thomas v. City of Blanchard*, 548 F.3d 1317, 1323 (10th Cir. 2008) (citation omitted). The inquiry is a "practical one" that requires a close consideration of an employee's actual job duties. *Id.*

Here, in plain contradiction to the inferences Defendants attempt to draw from Mr. Dennis's job description, Mr. Dennis was expressly *prohibited* from speaking to the press in an official capacity under DPS's media policy. *See* Exhibit 1 ("Media Policy"). Defendants claim that Mr. Dennis's speech to the press was aligned with "[o]ne of his primary objectives as principal…to 'communicate the [school's] vision, mission, and culture strategy to…external stakeholders." Motion to Dismiss, p. 14, citing Defense Exhibit B [sic], p. 1. "External stakeholders" is not defined in the job description, and there is no mention of the press as one such stakeholder. Defendants further cite vague language from the job description that Mr.

Dennis's job involved "community and district relations" with no support for the proposition that "community relations" involves speaking directly to the press in an official capacity. *Id.* at 14, citing Defense Exhibit A, pp. 2-3. There is nothing in the Complaint alleging that Mr. Dennis had ever spoken to the press before as part of his job duties, and nothing in Defendants' exhibits or motion suggests that Mr. Dennis had ever been called upon to do so either.

Rather, the "Media Relations" policy in the Denver Public Schools Employment Practice Manual (another public document) specifically instructs all DPS staff *not* to speak to the media in an official capacity, acknowledging that staff have "**individual freedom**…to express their **personal opinions** on District actions and policies," but that solely "the District is responsible for coordinating official comment on all matters regarding the District." Exhibit 1 (emphasis added). Thus, the District's own Media Policy makes clear that the media is *not* an external stakeholder to whom Mr. Dennis is expected to speak in an official capacity, though he may do so in a private capacity. If there is any question about whether this Media Policy applied to Mr. Dennis in his role as Principal, it is answered by Defense Exhibit C, Mr. Dennis's termination letter, which cites DPS Policy G – Media Relations (the Media Policy) as a reason for termination. A fact-intensive inquiry into Mr. Dennis's actual job duties clearly demonstrates that his speech was expressly not "commissioned" by his employer, and therefore he spoke to the press only as a citizen. *Thomas*, 548 F.3d at 1323.

Defendants' arguments that Mr. Dennis was well-known as Principal and "would naturally be regarded as the public face of [McAuliffe]" does not place his speech back in the ambit of speech pursuant to his official duties. Motion to Dismiss, p. 15 (citing *Foley v. Town of Randolph*, 598 F.3d 1, 7-8 (1st Cir. 2010)). In *Foley*, the First Circuit considered the fact that the Fire Chief plaintiff was in uniform speaking at a press conference at the scene of a fire as

evidence to help determine the open question of whether such speech was within the scope of his employment. *Id.* at 8-9. Had there been a policy in place stating that the Fire Chief was not authorized to make official comments to the press, that question would have been answered without needing to look to such evidence. As evident in its policies, DPS wishes to control official comments to the media at a level above Mr. Dennis's rank, and therefore Mr. Dennis was only authorized to express his personal opinions as a citizen to the media, as he did here.

Nor does Mr. Dennis's physical location in his office (after school hours) while speaking to the media place his speech within the scope of his employment. Defendants claim this location gave Mr. Dennis access to a "forum" he would not have but for his employment – but the "forum" or audience that Mr. Dennis was accessing through his speech was through 9News's broadcast, not an on-campus forum. *Cf. id.* at 9-10 (finding that the Fire Chief's access to the audience at a press conference constituted "a forum" to which he had access because of his position, to which there was "no relevant analogue to speech by citizens." *Garcetti*, 547 U.S. at 424). Citizens do have access to speak to the media in the way that Mr. Dennis did, making his speech a "relevant analogue" to citizen speech. *Id.* at 8 ("Any citizen can be interviewed by a reporter about her reaction to an event or her thoughts about an issue.")

Finally, the content of Mr. Dennis's speech does not render the speech within the scope of his employment. In making this argument, Defendants are conflating two separate steps of the *Garcetti/Pickering* test. *See Pryor*, 2022 U.S. Dist. LEXIS 235189 at *33-34 ("Defendants combine and conflate these two inquiries [speech made pursuant to official duties and speech on a matter of public concern], arguing that Mr. Pryor's speech related to his position as a volunteer football coach and as a founder of the STEAM Academy and so is not protected."). These are two separate and distinct steps that must be evaluated individually. *Id.* The Supreme Court's

"precedents dating back to *Pickering* have recognized that speech by public employees on subject matters related to their employment holds special value *precisely because* those employees gain knowledge of matters of public concern through their employment." *Lane*, 573 U.S. at 237; *see also Seifert v. Unified Gov't of Wyandotte Cty.*, 779 F.3d 1141, 1152 (10th Cir. 2015). "Government employees are often in the best position to know what ails the agencies for which they work." *Waters* v. *Churchill*, 511 U. S. 661, 674 (1994) (plurality opinion). Defendants do not dispute that Mr. Dennis's speech was on a matter of public concern, and instead claim that because Mr. Dennis spoke about DPS policies at McAuliffe, this proves he was speaking in an official capacity. However, the U.S. Supreme Court in *Garcetti* made it clear that the First Amendment protects public employees' right to speak publicly about the operations of their employers in their private capacity. *Garcetti*, 547 U.S. at 420 (citing *San Diego v. Roe*, 543 U.S. 77, 82 (2004) (*per curiam*) "Were [public employees] not able to speak on [the operation of their employers], the community would be deprived of informed opinions on important public issues. The interest at stake is as much the public's interest in receiving informed opinion as it is the employee's own right to disseminate it.")). The First Amendment protects Mr. Dennis's right to speak about his employer as a private citizen to a reporter, just like any other citizen could about a matter of public concern, and the subject matter of his speech does not bring his speech within the scope of his job duties.

Drawing all reasonable inferences in the light most favorable to Plaintiff, Mr. Dennis's job duties explicitly did *not* include speaking to the press in an official capacity, and therefore his speech was not within the scope of what he "was paid to do." *Rohrbough v. University of Colorado Hosp. Auth.*, 596 F.3d 741, 747 (10th Cir. 2010). He spoke in a private capacity, which

DPS's own Media Policy acknowledges is within his "individual freedom" under the First Amendment. Exhibit 1.

### d.   Mr. Dennis's speech was made regarding a matter of public concern.

Defendants did not challenge whether Mr. Dennis's speech was made regarding a matter of public concern, because it clearly was. "In order for a public employee to prevail on a claim that [his] dismissal violates protected speech rights, the court must first determine that [his] speech is protected by the First Amendment. The First Amendment protects a public employee's speech when it involves a matter of public concern." *Hom v. Squire*, 81 F.3d 969, 974 (10th Cir. 1996); *Horstkoetter v. Department of Public Safety*, 159 F.3d 1265, 1271 (10th Cir. 1998). School safety, particularly in an era of mass school shootings, can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). "There is no dispute that the safety of school children is a matter of significant public concern." *Reidenbach v. U.S.D. No. 437*, 912 F. Supp. 1445, 1450 (D. Kan. 1996) (citing *Johnsen v. Independent School Dist.*, 891 F.2d 1485, 1490 (10th Cir. 1989); *Luethje v. Peavine School Dist.*, 872 F.2d 352, 355 (10th Cir. 1989)). More generally, "revealing official shortcomings in the public school system and pushing administrators to do better" has been found by this Court to constitute a matter of public concern. *Pryor*, 2022 U.S. Dist. LEXIS 235189 at *35-36.

Furthermore, when determining whether speech is made regarding a matter of public concern, courts consider "the motive of the speaker" to "attempt to determine whether the speech was calculated to redress personal grievances or whether it had a broader public purpose." *Gardetto v. Mason*, 100 F.3d 803, 812 (10th Cir. 1996). The speech must "sufficiently inform the

issue as to be helpful to the public in evaluating the conduct of the government." *Wilson v. City of Littleton*, 732 F.2d 765, 768 (10th Cir. 1984).

Here, Mr. Dennis's speech regarding DPS's dangerous pat-down policy, which was subjecting teachers and students alike to the risk of harm by gun violence, falls squarely within the category of "the safety of school children." *Reidenbach*, 912 F. Supp. at 1450. Mr. Dennis spoke to the public via the media, clearly demonstrating his "broader public purpose" beyond any "personal grievances" to inform the public of the extent to which DPS was failing to protect its students and staff. *Gardetto*, 100 F.3d at 812. His speech directly illustrated DPS's failings, thereby assisting the public "in evaluating the conduct of the government." *Wilson*, 732 F.2d at 768. Therefore, Mr. Dennis's speech constitutes a matter of public concern.

### e. DPS's interests in promoting government efficiency do not outweigh Mr. Dennis's free speech interests.

Defendants did not challenge whether Mr. Dennis's speech was disruptive, because it clearly was not. The Supreme Court in *Pickering* established a balancing test between the free speech interests of a public employee and the government employer's interest in "in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568. In performing this balancing test, courts consider whether the speech: "1) impaired discipline by superiors or harmony among co-workers; (2) had a detrimental impact on close working relationships for which personal loyalty and confidence are necessary; (3) impeded the performance of the employee's duties or interfered with the regular operation of the enterprise; and (4) was aired in an inappropriate time, place, or manner." *Westbrook v. Teton Cty. Sch. Dist. No. 1*, 918 F. Supp. 1475, 1483 (D. Wyo. 1996) (citing *Connick*, 461 U.S. at 150-54). "In addition, the Tenth Circuit has assigned non-specific weights to the 'truth or falsity' of the

speech…and the value of the speech to public discourse…" *Id.* (citing *Wulf v. Wichita*, 883 F.2d 842, 858 (10th Cir. 1989); *Ware v. Unified School District*, 881 F.2d 906, 910 (10th Cir. 1989)).

There is no evidence in the Complaint that Mr. Dennis's speech resulted in any of the first three factors, which are factual questions. As to the fourth factor, as established above, Mr. Dennis's speech was fully compliant with federal and state law in terms of confidentiality, and therefore the speech was "aired" in an appropriate manner. *Id.* It was perfectly appropriate for Mr. Dennis to speak as a citizen after school hours to the press about a matter of public concern, and therefore the time and place of the speech was appropriate. *Id.* Finally, Mr. Dennis's speech was truthful and was undoubtedly of a matter of the highest value to public discourse in the aftermath of a terrifying school shooting at East High School. Drawing all reasonable inferences in the light most favorable to Plaintiff, Mr. Dennis's free speech interests outweighed any governmental interests in efficiency.

### f. Mr. Dennis's speech was a motivating and but-for cause in his firing.

Defendants did not challenge whether Mr. Dennis's speech was the but-for cause for his firing, because Plaintiff has clearly plausibly pleaded that his speech was a motivating factor in his termination. Retaliation for exercising one's First Amendment rights need not provide the only reason for the adverse employment action, but it must provide "a substantial or motivating factor." *Gann v. Cline*, 519 F.3d 1090, 1093 (10th Cir. 2008); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). As alleged in the Complaint and evidenced in Defendants' Exhibit C, DPS's "termination letter cited the circumstances surrounding the student on the Safety Plan including Mr. Dennis's decision to speak to 9News, as well as various other complaints over the years that had all been proven unfounded or not violative of DPS policy." Complaint, ¶ 75. The fact that the first disciplinary action taken that led to Mr. Dennis's termination occurred just two weeks after the interview with 9News reveals that Mr. Dennis's

protected speech was the true motivating factor behind DPS's decision to terminate him. *See Candelaria v. EG&G Energy Measurements, Inc.*, 33 F.3d 1259, 1262 (10th Cir. 1994); *Seifert*, 779 F.3d at 1158 ("The short time between [the protected activity] and the adverse action supports an inference of retaliatory motive."); *see also Hall v. U.S. Dep't of Labor*, 476 F.3d 847, 859 (10th Cir. 2007) ("A factfinder may infer retaliatory motive from the fact that a hostile action is taken shortly after an employee's protected activity." (citation omitted)). Drawing all reasonable inferences in favor of Plaintiff, these final two factors of the *Garcetti* test are sufficiently pleaded.

### 2. The Individual Defendants are not entitled to qualified immunity.

The Individual Defendants are not entitled to qualified immunity because Plaintiff's right not to be subjected to First Amendment violations in the manner he was here was "sufficiently clear that every reasonable official would have understood that what he [was] doing violate[d] that right." *Mullenix*, 577 U.S. 7, 11 (2015) (citation omitted). The Supreme Court has made clear that a finding of clearly established law does "not require a case directly on point, [as long as] existing precedent…[has] placed the…constitutional question beyond debate." *Id.* The Tenth Circuit has long recognized that "[i]t is particularly difficult in the First Amendment context to determine whether the applicable law was 'clearly established' because the *Connick* public concern inquiry and the *Pickering* balancing test are to be performed in light of particularized facts on a case-by-case basis." *Considine v. Bd. of Cty. Comm'rs*, 910 F.2d 695, 702 (10th Cir. 1990). Though *Garcetti* has since added the official capacity prong to the analysis since *Considine*, that too is a highly fact-specific inquiry making it difficult to find cases directly on point.

However, both the Supreme Court and the Tenth Circuit have long held that "general statements of the law are not inherently incapable of giving fair and clear warning to officers." *Kisela v. Hughes*, 138 S. Ct. 1148, 1153 (2018) (quoting *White v. Pauly*, 137 S. Ct. 548, 552 (2017)). "It is not necessary…for plaintiffs to find a case with exact corresponding factual circumstances; defendants are required to make reasonable applications of the prevailing law to their own circumstances." *Murrell v. Sch. Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999) (citation omitted). Fundamentally, courts "cannot find qualified immunity wherever [they have] a new fact pattern." *Casey v. City of Fed. Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). Instead, "[e]ven when no precedent involves facts materially similar to [the case at issue], the right can be clearly established if a precedent applies with obvious clarity." *Lowe v. Raemisch*, 864 F.3d 1205, 1210 (10th Cir. 2017) (citation omitted).

Even without precedential or persuasive authorities, a right can be clearly established when it is obvious. *See Taylor v. Riojas*, 141 S. Ct. 52, 53–54 (2020) (per curiam). "After all, some things are so obviously unlawful that they don't require detailed explanation." *Browder v. City of Albuquerque*, 787 F.3d 1076, 1082 (10th Cir. 2015). "Accordingly, a constitutional right is clearly established for qualified immunity purposes not only when it has been specifically adjudicated but also when it is manifestly included within more general applications of the core constitutional principle invoked." *Sims v. Labowitz*, 885 F.3d 254, 264 (4th Cir. 2018). Defendants' conduct was obviously unlawful and "plainly [does] not qualify as the type of bad guesses in gray areas that qualified immunity is designed to protect." *Id.* (citation omitted).

First, as explained above, Mr. Dennis's speech was lawful under FERPA and Colorado state law, was on a matter of public importance, was not within the scope of his employment, and was not outweighed by government efficiency interests. It was therefore protected speech, and

terminating Mr. Dennis in retaliation to his First Amendment protected speech is a constitutional violation.

Second, Supreme Court and Tenth Circuit caselaw as well as the weight of authority put Defendants on notice that their firing of Mr. Dennis violated his clearly established First Amendment rights. *Pickering* serves as longstanding precedent for the pre-*Garcetti* proposition that a school employee is protected by the First Amendment when he speaks to the media as a private citizen on a matter of public concern, even if it relates to and is critical of his employer. *Pickering*, 391 U.S. at 574 ("we hold that, in a case such as this, absent proof of false statements knowingly or recklessly made by him, a teacher's exercise of his right to speak on issues of public importance may not furnish the basis for his dismissal from public employment."); *see also Utter v. Colclazier*, 714 F. App'x 872, 884 (10th Cir. 2017) (reversing the lower court's dismissal of the teacher plaintiff's First Amendment retaliation claim and finding it clearly established law that "public teachers have a First Amendment right to be free from retaliation for commenting on matters of public concern."). Though *Pickering* involved a plaintiff teacher who spoke to the media and criticized his superiors about a school bond issue, it is clearly established that school safety is also a matter of public importance. *See Wulf v. Wichita*, 883 F.2d 842, 858 (10th Cir. 1989); *Ware v. Unified School District*, 881 F.2d 906, 910 (10th Cir. 1989). The remaining relevant facts – that Pickering spoke to the media about school issues and criticized his superiors – are sufficiently similar to put Defendants on notice of Mr. Dennis's First Amendment rights. Factually, Defendants were clearly aware that this constitutional right protects Mr. Dennis's citizen speech about District policies, as evidenced in the Media Policy at Exhibit 1 which recognizes staff's "individual freedom…to express their personal opinions on District actions and policies" to the press. Exhibit 1.

Post-*Garcetti*, Defendants were put on notice by the weight of authority that their own District policy *not* to speak to the media in an official capacity placed Mr. Dennis's speech outside the scope of his official duties. The First Circuit has found that where an employer's own policies direct an employee not to speak to the press, an employee's choice to do so is explicitly outside the scope of their employment. *Bruce v. Worcester Reg'l Transit Auth.*, 34 F.4th 129, 137 (1st Cir. 2022) ("that a reasonable juror could find that Bruce spoke -- as the defendants' own position accepts -- to Telemundo contrary to his employer's directives indicates that his speech fell outside his professional duties."); *see also Dahlia v. Rodriguez*, 735 F.3d 1060, 1075 (9th Cir. 2013) (*en banc*) ("when a public employee speaks in direct contravention to his supervisor's orders, that speech may often fall outside of the speaker's professional duties."). In *Bruce*, the plaintiff was a Central Mass Transit Management, Inc. ("CMTM") bus driver who was terminated from his government-contracted job following public comments he made to a television network about proposed budget cuts. *Bruce*, 34 F.4th at 131. CMTM policy required all employees to seek preapproval before making public comments representing CMTM or the Worcester Regional Transit Authority ("WRTA"). Like Mr. Dennis, after speaking to the press, Mr. Bruce was notified by his employer that he was being investigated for making unauthorized statements to the media in violation of policy. *Id.* at 134. In *Bruce* as here, there was no dispute that the statements were regarding a matter of public concern, so the question for the court was whether Bruce "spoke as a citizen" or "pursuant to [his] official duties." *Id.* at 135 (citations omitted). The court found that because he was expressly directed by his superiors *not* to speak to the press in an official capacity, a reasonable jury could find that his speech "fell outside his professional duties." *Id.* at 137.

Accordingly, as pleaded, Defendants' termination of Mr. Dennis in retaliation for his speech in a private capacity to the media about the dangerous pat-down policy being forced upon schools by Defendants plausibly states a claim for violation of Mr. Dennis's clearly established First Amendment rights.

**B.   Mr. Dennis's due process claims are adequately pleaded.**

Through their actions in terminating Mr. Dennis, Defendants deprived Mr. Dennis of due process of law, infringing on both his liberty and property interests. "The Fourteenth Amendment provides that no state may deprive a person of life, liberty, or property without due process of law." *McDonald v. Wise*, 769 F.3d 1202, 1210 (10th Cir. 2014) (citing U.S. Const. amend. XIV, § 1). "To assess whether an individual was denied procedural due process, courts must engage in a two-step inquiry: (1) did the individual possess a protected interest such that the due process protections were applicable; and, if so, then (2) was the individual afforded an appropriate level of process." *Merrifield v. Bd. of Cty. Comm'rs for Cty. of Santa Fe*, 654 F.3d 1073, 1078 (10th Cir. 2011) (internal quotation marks and citation omitted).

**1.   Mr. Dennis was deprived of his liberty interest in his good name and reputation without due process.**

Defendants do not challenge whether Mr. Dennis has sufficiently pleaded that he was deprived of his liberty interest in his good name and reputation, and only claim that the deprivation was cured by an adequate name-clearing hearing. Motion to Dismiss, p. 20. A public employee has a liberty interest in his good name and reputation as they relate to his continued employment. *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir. 1994). "The government infringes upon that interest when: (1) it makes a statement that 'impugn[s] the good name, reputation, honor, or integrity of the employee'; (2) the statement is false; (3) the statement is made during the course of termination and 'foreclose[s] other employment opportunities'; and (4) the

statement is published, in other words disclosed publically." *McDonald v. Wise*, 769 F.3d 1202,

1212 (10th Cir. 2014) (citing *Workman*, 32 F.3d at 481). Once a showing has been made of those

four elements, a public employee "must receive an adequate name-clearing hearing." *Id.* at 1213.

An adequate name-clearing hearing provides "the employee with a *public forum* to clear his

name *before the governing body that discharged him*." *Rosenstein v. City of Dallas, Texas*, 876

F.2d 392, 396 (5th Cir. 1989) (emphasis added). The purpose of a name-clearing hearing is to

"give[] the plaintiff an opportunity to…clear[] his name of any false statements made about him,

and cur[e] the injury to his reputation." *McDonald*, 769 F.3d at 1213.

First, as is unchallenged in the Motion to Dismiss, Defendants infringed upon Mr.

Dennis's liberty interest in his good name and reputation by publicly calling Mr. Dennis racist

and a white supremacist in connection with the de-escalation room, and specifically by stating

that all students placed in the de-escalation room were students of color. Complaint, ¶¶ 88-89.

These statements "impugned the good name, reputation, honor, or integrity" of Mr. Dennis,

*McDonald*, 769 F.3d at 1212, and the claim that *only* students of color were put in the de-

escalation room is demonstrably false – "[w]ithin the first week of August, Defendants received

a letter from a white parent explaining how the de-escalation room had been used for her white

child as an agreed-upon part of her child's Individualized Education Plan (IEP)," and that "her

child prefers to be in the room alone." Complaint, ¶ 142. The Defendants' false and defamatory

statements were made during public town hall meetings, to the press, and on social media in the

course of Mr. Dennis's termination, and have foreclosed employment opportunities. Complaint,

¶ 91 ("Mr. Dennis has been unable to find a comparable position in another district because the

defamatory statements of the Defendants have so tarnished his reputation that no employer will

hire him as a principal."). Finally, these statements were published, "being carried by print,

television, official social media pages, and internet news media outlets." Complaint, ¶ 146. Mr. Dennis has adequately pleaded that Defendants infringed upon his liberty interest in his good name and reputation.

Defendants claim that Mr. Dennis was provided with an adequate name-clearing hearing. Here, Defendants again seek to introduce Defense Exhibits D and E, which are outside the four corners of the Complaint and should be disregarded by this Court at the Rule 12(b)(6) stage. *Macarthur*, 309 F.3d at 1221. However, if this Court chooses to consider those exhibits, they demonstrate that Mr. Dennis was not afforded an adequate name-clearing hearing. Specifically, Defense Exhibit D is DPS Policy GDQD-R, which dictates procedures for dismissal of DPS employees. The post-termination hearing offered is before an "impartial hearing officer" who is only authorized to "issue a written recommendation to the Superintendent or designee," which "shall be advisory only and shall not be binding on the Superintendent or designee." Defense Exhibit D, p. 3. Furthermore, "[a]ll hearings conducted by the hearing officer shall be confidential." *Id.* Thus, Mr. Dennis was not provided with access to a "public forum" with which to publicly clear his name, and the hearing officer is not "the governing body that discharged him" but rather an independent party with no decision-making authority. *Rosenstein*, 876 F.2d at 396. The central elements of a name-clearing hearing – a public forum and the presence of the actual decision-makers at the hearing – are missing from the process, making the GDQD-R procedures constitutionally deficient under the Fourteenth Amendment. Mr. Dennis was therefore deprived of his liberty interest in his good name and reputation without due process of law.

**2.** **Mr. Dennis was deprived of his property interest in continued employment without due process of law.**

Defendants argue that Mr. Dennis did not have a property interest in his continued employment, and also that he was offered adequate due process through pre- and post-termination proceedings. Motion to Dismiss, pp. 21-23. However, Mr. Dennis has adequately pleaded that he had a property interest in continued employment grounded in a mutually explicit understanding. The U.S. Supreme Court has long held that "'property' interests subject to procedural due process protection are not limited by a few rigid, technical forms. Rather, 'property' denotes a broad range of interests that are secured by 'existing rules or understandings.'" *Perry v. Sindermann*, 408 U.S. 593, 601 (1972). "A person's interest in a benefit is a 'property interest' for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit." *Id.*

As alleged in the Complaint, Mr. Dennis was a third-party beneficiary of the contract between the Northeast Denver Innovation Zone ("NDIZ") and DPS, which guaranteed that Mr. Dennis's employment could not be terminated unilaterally by DPS without NDIZ approval. Complaint, ⁋ 159. This constitutes a "mutually explicit understanding" between Mr. Dennis, the third-party beneficiary of the contract, and Defendants, parties to the contract. *Id*. Defendants claim that the contract provisions were followed because "if the parties fail to agree [on a termination decision], either party may bring the dispute to the DPS Board of Education." Motion to Dismiss, p. 22, citing Complaint, ⁋ 79. However, this provision assumes that DPS had sought the approval of NDIZ and the two parties disagreed. *Id*. DPS never sought NDIZ approval for its decision to terminate Mr. Dennis, and the specific disagreement between NDIZ and DPS was therefore never brought to the DPS Board of Education. Complaint, ⁋ 160.

The contract between NDIZ and DPS gave Mr. Dennis the right to rely on NDIZ's protection of his continued employment. *See Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)

29

("It is a purpose of the ancient institution of property to protect those claims upon which people rely in their daily lives, reliance that must not be arbitrarily undermined."). This "benefit" of NDIZ protection was intended to protect Mr. Dennis's interest in continued employment, which constitutes "a 'property interest' for due process purposes" because of the "mutually explicit understandings that support his claim of entitlement to the benefit" contained within the NDIZ-DPS contract. *Perry*, 408 U.S. at 601. Courts must consider "[e]xplicit contractual provisions…in the light of the surrounding circumstances" when determining whether a property interest exists. *Id.* at 602. Here, NDIZ is a nonprofit organization with the mission of creating "a new model of more autonomous education management." Complaint, ¶ 35. In light of the purpose of NDIZ, it is clear that the NDIZ-DPS contractual provision constituted a substantive right to autonomous education oversight over the conditions of his employment rather than just a "grant of procedure." Motion to Dismiss, p. 22. Unlike other DPS employees who were not employed under the Innovation Zone model, the terms of Mr. Dennis's employment gave him the benefit of an expectation of continued employment beyond DPS's authority. Drawing all reasonable inferences in favor of Plaintiff, Mr. Dennis was deprived of this property interest in continued employment, and therefore he should have been afforded constitutionally sufficient procedural due process.

Defendants claim that the deprivation was cured because Mr. Dennis was granted sufficient procedural due process through access to pre-termination process and a post-termination hearing. While it is true that the constitutionally required pre-termination process is minimal and can be informal, *Riggins v. Goodman*, 572 F.3d 1101, 1108 (10th Cir. 2009), a "full post-termination hearing is required." *Tonkovich v. Bd. of Regents*, 159 F.3d 504, 517 (10th Cir. 1998). "[T]he opportunity for a post-termination evidentiary hearing *before a neutral*

*decisionmaker* is required for due process." *Rodgers v. 36th Dist. Court*, 529 F. App'x 642, 650 (6th Cir. 2013) (emphasis added); *see also Newman v. Burgin*, 930 F.2d 955, 960 (1st Cir. 1991) (holding that procedural due process requires a trial-type hearing before a neutral decisionmaker). Again, this Court should disregard Defendants' reference to information outside the Complaint at the F.R.C.P. 12(b)(6) stage, and solely consider the fact that the Complaint alleges that "Defendants failed to provide constitutionally sufficient due process to challenge the termination by failing to provide an opportunity to present evidence in his defense in front of a decisionmaker." Complaint, ⁋ 162. However, even looking at Defense Exhibit D, DPS's Policy GDQD-R, Mr. Dennis was only afforded the opportunity to present a defense in front of a hearing officer whose "report shall be advisory only and shall not be binding on the Superintendent or designee." Defense Exhibit D, p. 3. Therefore, the process afforded Mr. Dennis lacked this critical and most basic requirement for due process, rendering the process constitutionally deficient.

Because Mr. Dennis was not afforded an *opportunity* to present a defense before an actual decisionmaker and therefore was not afforded constitutionally adequate due process, Mr. Dennis did not waive his property due process claim by foregoing the final post-termination hearing. *Cf. Pitts v. Bd. of Educ.*, 869 F.2d 555, 557 (10th Cir. 1989) (holding that because the plaintiff was afforded a hearing that "clearly [met] the requirements of the due process clause," his decision to forego the opportunity constituted a waiver). The Tenth Circuit has emphasized that "courts indulge every presumption against the waiver of fundamental constitutional rights." *United States v. Williamson*, 806 F.2d 216, 219 (10th Cir. 1986). Here, at the F.R.C.P. 12(b)(6) stage, Mr. Dennis should be granted the presumption that the post-termination process that Mr.

Dennis declined was constitutionally deficient for purposes of determining whether he waived his Fourteenth Amendment rights.

Because Mr. Dennis was deprived of a property right in continued employment without sufficient due process protection in his post-termination hearing, Mr. Dennis has adequately pleaded a deprivation of his property interest without due process of law.

### 3. **The Individual Defendants are not entitled to qualified immunity from Plaintiff's due process claims.**

As a preliminary matter, Plaintiff has adequately pleaded that each of the Individual Defendants has directly participated in the due process constitutional violations described above, subjecting them to individual liability. This is a causation question, and the Tenth Circuit has held that personal participation causing a constitutional deprivation is sufficient to impose liability in a Section 1983 case, so long as it amounts to a "substantial factor in bringing the injury about." *Lippoldt v. Cole*, 468 F.3d 1204, 1220 (10th Cir. 2006) (internal citations removed) (holding that even "'a reluctant scrivener,' whose actual participation in the permit denial was negligible" had sufficient personal participation to impose liability in a First Amendment Section 1983 case because his "conduct was a substantial factor" in the violation); *see also Northington v. Marin*, 102 F.3d 1564, 1568-69 (10th Cir. 1996).

Each of the six Board Members named as defendants were directly involved in the deprivation of Mr. Dennis's liberty and property interests without due process of law. Each of them voted to terminate Mr. Dennis on the basis of the final termination letter that included the defamatory and pretextual de-escalation room excuse as grounds for termination, which directly caused Mr. Dennis's reputation to be publicly tarnished. Complaint, ¶ 96. Their individual votes also served to ratify both the defamatory statements made about Mr. Dennis and the constitutionally deficient process afforded to Mr. Dennis to challenge his termination, directly

causing the deprivations of his liberty and property interests. Each Board Member could have voted against termination based on process deficiency reasons, as did Board Member Scott Baldermann, who is not named in this Complaint. *Id.*, ¶ 93. Defendants Gaytán, Anderson, and Esserman are clearly responsible for their individually defamatory statements about the use of an "incarceration" room, which as pleaded in the Complaint were part of "an effort to turn public opinion against Mr. Dennis" and were used as evidence of "racism and white supremacy." *Id.*, ¶¶ 88-89. Defendants' reference to a dictionary definition of "incarceration" out of the context alleged in the Complaint does nothing to negate these Defendants' direct causation of the injury to Mr. Dennis's reputation. These allegations in the Complaint clearly identify "specific actions taken by particular defendants…that violated a plaintiff's clearly established constitutional rights." *Pahls v. Thomas*, 718 F.3d 1210, 1228 (10th Cir. 2013).

Superintendent Alex Marrero is vested with "authority to make all operational decisions on behalf of DPS and to implement DPS' policies and procedures," *id.*, ¶ 19, and therefore possessed "supervisory responsibility" over specific policies that violated Mr. Dennis's clearly established constitutional rights. *Pahls*, 718 F.3d at 1228. He was directly responsible for DPS's operational decisions regarding the defamatory nature of Mr. Dennis's final termination letter, as well as the constitutionally deficient post-termination proceeding provided to him.

The Individual Defendants were on notice that the constitutional violations described above were contrary to clearly established law. In *McDonald v. Wise*, Tenth Circuit found that the plaintiff's liberty interest in his good name and reputation was harmed by the Mayor of Denver, his employer, when he told the media that the plaintiff was "fired for serious misconduct" based on another employee's unproven claims of sexual harassment. *McDonald*, 769 F.3d at 1212. Here, just as in *McDonald*, the city employer terminated the plaintiff based in

part on unsubstantiated allegations of "immorality" (in this case, racism), made "stigmatizing statements" to the media based on those unsubstantiated allegations, and caused the plaintiff to be unable to find comparable employment as a direct result of that public shaming. *Id.*

*McDonald* also clearly establishes the proposition that a name-clearing hearing must be in "a public forum…before the governing body that discharged him." *Id.* at 1214 (citing *Rosenstein*, 876 F.2d at 396; *Gunasekera v. Irwin*, 551 F.3d 461, 470 (6th Cir. 2009)). The weight of authority makes clear that a name-clearing hearing cannot be a confidential internal proceeding, like that offered to Mr. Dennis. *See Gunasekera*, 551 F.3d at 470 ("A name-clearing hearing with no public component would not address this harm because it would not alert members of the public who read the first report that Gunasekera challenged the allegations."); *see also Patterson v. City of Utica*, 370 F.3d 322, 337 (2nd Cir. 2004) (holding that an unpublicized, internal name-clearing hearing was constitutionally insufficient because of the "substantial risk that the stigma against plaintiff would remain after such hearing."). Therefore, the Individual Defendants had notice through clearly established law that Mr. Dennis's liberty interest in his good name and reputation was infringed without due process.

Similarly, the weight of authority put the Individual Defendants on notice that a plaintiff can have a property interest in continued employment as a third-party beneficiary to another contract establishing that interest. Courts look to whether the language of a contract related to employment creates "job security." *See Lashbrook v. Oerkfitz*, 65 F.3d 1339, 1346 (7th Cir. 1995). In *Cheli v. Taylorville Cmty. Sch. Dist.*, the Seventh Circuit found that because a collective bargaining agreement to which the plaintiff was a third-party beneficiary created additional protections (a finding of "reasonable cause") before termination which "confined defendants' discretion to terminate him, then, Cheli enjoyed a protected property interest for the

purposes of due process." *Cheli v. Taylorville Cmty. Sch. Dist.*, 986 F.3d 1035, 1040 (7th Cir. 2021). Here, as in *Cheli*, the contract between NDIZ and DPS "confined defendants' discretion to terminate him" by requiring DPS to obtain NDIZ approval before terminating Mr. Dennis. This additional check on Defendants' authority to terminate Mr. Dennis created an additional protection in NDIZ and in effect raised the bar for termination above at-will employment.

The Individual Defendants violated Mr. Dennis's clearly established constitutional rights to due process to protect his liberty and property interests. Therefore, they are not entitled to qualified immunity.

## IV. CONCLUSION

For the reasons set forth above, Defendants' Motion to Dismiss must be denied.

Respectfully submitted this 5th day of December 2023.

KILLMER LANE, LLP

*s/ Madison Lips*

_____
David A. Lane
Madison Lips
1543 Champa Street, Suite 400
Denver, CO 80202
(303) 571-1000
(303) 571-1001 fax
dlane@killmerlane.com
mlips@killmerlane.com
*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5th, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Michael Brent Case
Jonathan P. Fero
Semple, Farrington, Everall & Case, P.C.
1120 Lincoln Street, Suite 1308
Denver, CO 80203
Phone: 303-595-0941
bcase@semplelaw.com
jfero@semplelaw.com

*Counsel for Defendants*

KILLMER LANE, LLP

*s/ Jamie Akard*

_____

Jamie Akard

## <u>INDEX OF EXHIBITS TO PLAINTIFF'S RESPONSE<br>TO DEFENDANTS' MOTION TO DISMISS</u>

1. Exhibit 1 – DPS Media Policy