# *Dennis*

# *v.*

# *School District No 1*

Alex Marrero

November 17, 2025

AB Litigation SERVICES
216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

Exhibit B
Defts.' Mot. for Summary Judgment

mean something else. But to the second part of your question, yes, the person should be allowed to go to a public school.

**Q Okay. Should he be treated any differently than any other student?**

A I don't know how to answer that. I think every student gets individual attention. Can you rephrase --

**Q Okay.**

A -- that question?

**Q Well, did this -- should this kid -- look, you know, I mean, were there any special -- first of all, this kid was attending McAuliffe, wasn't he?**

A Yes, he was.

**Q And Kurt Dennis objected to that, didn't he?**

A Yes, he did.

**Q And you said, basically -- when Kurt Dennis raised that objection to you or the Board of Education, you basically said, Too bad. That's our policy. He's going to McAuliffe, right?**

A Correct.

**Q And so the kid did go to McAuliffe, right?**



A Correct.

**Q And was he given any special treatment that most kids weren't given?**

MR. CASE: Object as to foundation.

A Any specifics you want me to respond to?

**Q (BY MR. LANE) Most kids when they go to school they walk into school through the front door. They go to their locker. They go to their class. Right?**

A Yes.

**Q Is that what this kid was doing also?**

A You're referring to the pat-downs at the security checkpoints?

**Q Yes.**

A Well, then that was part of the treatment for his reengagement on -- on the school campus. Very common. Happens across the system.

**Q Well, it doesn't happen to every kid. It just happens to some kids, right?**

A Yes. It happens to students like this young man who had some engagements outside the school. For that population --

**Q Okay.**

A -- this con- --

**Q Well, why? I mean, what was going on**



**with this kid that -- I mean, you were patting him down, right?**

A The individuals at McAuliffe were, yes.

**Q Why?**

A His prior allegations and incidents involved some firearms, so part of the reengagement is to ensure they're not bringing them on campus.

**Q So, you know, our -- you understand that in order to arrest somebody and to prosecute charges there has to be probable cause to believe that this person has committed the offense charged, right?**

MR. CASE: Object as to form.

A Can you restate that again.

**Q (BY MR. LANE) Yeah. You know under the Constitution of the United States of America the Fourth Amendment says, In order to proceed with an arrest or charges against someone, there must be probable cause to believe that that person has committed a crime, correct?**

MR. CASE: Object as to form.

A Yeah, I do remember that.

**Q (BY MR. LANE) Okay. So here we have this kid facing attempted murder charges, correct?**

A Yes.

**Q And armed robbery charges, correct?**



A Yes.

**Q And we know that there is at the very least probable cause to believe he's done these things, correct?**

MR. CASE: Object as to foundation.

A No, I don't know about that. That was yet to be determined at that time.

**Q (BY MR. LANE) Well, he was arrested and he was charged.**

A Released.

**Q That requires probable cause, right? Yes, he was released on bond. Correct?**

MR. CASE: Object as to foundation.

A I don't recall whether there was a bond.

**Q (BY MR. LANE) Okay. You were patting him down because you suspected that this kid is different than your average student because this kid may be armed and/or violent? That's why he gets patted down, isn't it?**

MR. CASE: Object as to form.

A I wouldn't say it that way, Mr. Lane.

**Q (BY MR. LANE) Well, you don't pat down every kid, right?**

A No, we do not.

**Q You pat down the kids that you worry may**

Exhibit B
Defts.' Mot. for Summary Judgment

be armed and/or violent, correct?
A I would say students who may have access to firearms and weapons to avoid them coming on grounds.
Q Well, every student at McAuliffe has some access to firearms, as far as you know? You don't know who has access to firearms and who doesn't, do you?
A I do not know.
Q Okay. So it's not just access to firearms that cause these pat-downs. It is kids that you believe have shown some history of having firearms and being violent, correct?
A I would agree with that, yes.
Q Okay. So here we have a kid being patted down because you -- first of all, it's called a safety plan, right?
A That is correct.
Q And is this an administrative regulation or is this a board policy?
A That's an administrative regulation.
Q Okay. So you agree that at some point some kids need to be patted down, right?
A That is correct.
Q And those kids are kids that have -- it's



not just having propensity to have a firearm, because a kid going hunting with their mom or dad has access to a firearm, but you don't pat those kids down, right?
MR. CASE: Object as to form.
A I don't recall of any hunter being patted down, no.
Q (BY MR. LANE) Right. Because simple access to a firearm is not enough to get you patted down at DPS. You have to have a firearm that makes you dangerous to other people, correct?
A Yeah.
Q Okay. So this kid obviously was deemed by you or whoever put the safety plan together to be potentially dangerous, right?
A Required to have a safety plan that required patting down, safe enough to engage with the general popu- -- population.
Q Okay. The court -- the courts didn't require a pat-down on this kid, right?
MR. CASE: Object as to foundation.
A They did not.
Q (BY MR. LANE) They said that --
A They released him to us.
Q Well, they released him to the community,



not to you, right?
A We're the local educational agency, so they released him to us.
Q Are you saying you were acting as his parents?
A That is not what I said.
Q Okay. The kid was released -- the order releasing this kid is, I hereby release this kid to the custody of Denver Public Schools. That wasn't the order of the court, was it?
A No, it was not.
Q It was just, This kid is released to the custody of his parents or guardians, correct?
A That is correct.
Q And then in the normal course of things he goes to school, right?
A In the normal course of things he returns to his school, correct.
Q Right. And Denver Public Schools through you has decided, Wait a minute. This kid could be dangerous. We need to take special precautions for this kid, right?
A In the normal course of action he returned back to his home school, the school in which Mr. Dennis would not want him back. In order for him



to reengage there was a safety plan in place that required a pat-down.
Q Not in order for him to reengage. It was a safety plan that required a pat-down because you were afraid he might bring a gun to school, right?
A We're not afraid of that.
Q The whole purpose of the pat-down is to see if he's got a gun, right?
A That is correct.
Q Well, you don't have concerns about 99 percent of the other kids coming in, right, just that kid, right?
A Don't know about a percentage.
Q Dr. Marrero, you patted this kid down because you were worried that he might bring a gun to school, yes or no?
A I think the worry was more on the school than the district.
Q The worry is what?
A Is usually the folks receiving the young man or the young lady. It is done in tandem, so it's symbiotic. The district, of course, has a duty to provide support, and it's usually stemming from the receiving school, so --
Q Dr. Marrero, I don't know what that was

Exhibit B
Defts.' Mot. for Summary Judgment

in response to. My question is, he was getting patted down because you guys, meaning the school people, were afraid he might be bringing a gun to school, right?

A Yes, the school people.

Q Okay. Because -- and you were worried that if he brought a gun to school he might shoot somebody, right?

A That's always a possibility, but, yes, to the school people.

Q And Kurt Dennis took a position that kids who are charged criminally, like this kid was, with extremely violent armed felonies, shouldn't be around other students. That was his position, right?

MR. CASE: Object as to foundation.

A I recall that being his position or something close to that, yes.

Q (BY MR. LANE) Okay. And you are familiar with the shooting that occurred at East High School when that kid, who had a safety plan, shot two administrators, right?

A Yes.

Q And that kid was being patted down for the same kind of safety concerns that the kid at McAuliffe was being patted down for, right?



MR. CASE: Object as to foundation.

A I don't think they're the same -- the same safety concerns. Totally different cases.

Q (BY MR. LANE) I understand. But the issue was -- that kid got charged with a crime at East. The East kid got charged with a crime involving a gun, right, on the streets?

A I --

Q He got charged criminally --

A You said "East" to both of those students. Do you mind re- --

Q No. I'm saying, the kid at East High School was charged with a crime by the police and was in the court system for a gun-related violent crime, correct?

A Correct.

Q That's the same with the kid at McAuliffe, right?

A Correct.

Q They were both receiving the same kind of treatment, one at East, one at McAuliffe, and that is a pat-down by administrators, right?

A Correct.

Q And that is because in both situations DPS policy said, We are -- we don't want this kid



coming in with a gun. Let's make sure he doesn't have a gun. Right?

MR. CASE: Object as to form and foundation.

A That along with what you mentioned earlier in terms of the school personnel, yes.

Q (BY MR. LANE) Okay. And the two administrators at East got shot during the pat-down, right?

A Correct.

Q And that young man ultimately committed suicide, right?

A Unfortunately, yes.

Q Yes, very unfortunately.

A Tragically.

Q But patting a kid down isn't the end of it, is it? Meaning, administrators pat the kid down when he comes in, but first of all they've got to know how this kid's coming in, right, meaning --

A I don't know what you mean by that.

Q -- he's got to come in through the front door at a certain specific location at a certain specific time, right?

A Yes.

Q Okay. And that person is then greeted by



administrators, right?

A Typically, yes.

Q Okay. And that is all done in full view of any other students who happen to be wandering about at that point, right?

A Not necessarily.

Q Well, maybe yes, maybe no, right? I mean, a kid -- is the kid -- does the kid typically have to wait for everybody else to go into the school and then he's allowed to come in?

A Not necessarily.

Q Okay. Well, when a kid is greeted by two administrators at a school, that's possibly noticed by a lot of other children, right?

A Not necessarily, no.

Q Maybe yes, maybe no, right?

A It's possible.

Q Well, is it improbable?

A Is it improbable? No, it's not improbable.

Q Okay. And when a kid is greeted by administrators every day, it's not improbable that a lot of other kids look at that and say, Hmm, wonder what's up with that kid. Why does he get greeted by administrators every day? That might be on their

Page 37

minds possibly? You would agree with that?
A I don't think so.
Q Well, where do these pat-downs occur?
A It all depends on the case.
Q Okay. Are pat-downs done in view of other students?
A Usually they're not.
Q But sometimes they are, right?
A I'm sure it's happened.
Q Okay. Is there a policy telling people where they should do these pat-downs?
A No, it's a case-by-case.
Q Okay. So if an administrator decides to pat down a kid in front of -- full view of everybody else coming into the building, they can do that, right?
A Perhaps they can. It wouldn't be advisable.
Q Well, who advises them not to?
A That's all known -- clearly laid out in the safety plan. Also, here's where the administrators come in. If I can, I used to do them as a guidance counselor before I was an APM principal. And students used to come to my office because it was the safest place. And no one

Page 38

questioned that back then.
Q Okay.
A So it depends.
Q Well, you don't know where this kid at McAuliffe was being patted down, do you?
A I do not.
Q And you don't know where the kid at East was being patted down, do you?
A I do. It was by the main entrance in an office to the right side as soon as you enter the main corridor where, unfortunately, the shooting happened.
Q Okay. Are these administrators paid and trained to do pat-downs?
A Well, our administrators --
MR. CASE: Object as to form.
A Our administrators, like all employees, are paid. In the case of anyone who engages in a safety plan, implementation of pat-downs, yes, they are trained.
Q (BY MR. LANE) Trained to do pat-downs?
A Yes.
Q Okay. But that's not the end of the administrative pat-down situation, because that kid has to get followed around the school all day,

Page 39

doesn't he? In other words, you don't want a situation where a kid gets -- he passes a pat-down and then goes to another door, opens it up, and his buddy then hands him a gun through a side door to the school or gets one through a window or -- you know, right? I mean, that's a possibility?
MR. CASE: Object as to form.
A I don't -- I don't understand that. Can you --
Q (BY MR. LANE) A kid --
A -- restate?
Q Yes, I will restate. Let's say a kid is getting patted down but wants to bring a gun to school. If that kid stashes a gun in a bag near a door that's not monitored, during the school day that kid can go to that door, open up that door, grab the gun, and bring it into the school, right?
MR. CASE: Object as to form.
A I guess in this hypothetical it could -- it's probable, yeah.
Q (BY MR. LANE) Okay. So therefore, in order to be safe, these administrators have to follow the kid around all day long; isn't that correct?
A No. I disagree with that.
Q Okay. Do you know if the administrators

Page 40

at McAuliffe were following this kid around all day?
A I do not know.
Q Do you know that it's -- it was common knowledge at McAuliffe that this kid was being patted down?
A I did not know that, no.
Q Okay. Let's get back to students of color. Do you believe the race of this kid had anything whatsoever to do with Kurt Dennis saying, This kid should not be at McAuliffe?
A I think it did. I think if it was another student and a white student perhaps there wouldn't have been such a dedication for him to re- -- return -- to prohibit the return.
Q Okay. Well, do you recall Kurt Dennis saying that after what happened at East, where a kid getting patted down shot two administrators, that it's really not a safe policy to allow vi- -- kids that you have reason to believe are violent and armed to come to school until charges are resolved?
MR. CASE: Object as to foundation.
A Are you referring to the interview?
Q (BY MR. LANE) No. I'm referring to the interview; I'm referring to his conversations with DPS; I'm referring to his whole -- he's never

Exhibit B
Defts.' Mot. for Summary Judgment

deviated from that position for anyone, has he?
MR. CASE: Object as to foundation and form.
A I don't know if he's deviated. But I believe that is his position, yes.
Q (BY MR. LANE) Have you ever seen Kurt Dennis advocate that a white kid charged with a violent crime with a gun should be allowed to attend McAuliffe?
A I have not. It hasn't presented itself, I don't think.
Q Okay. So the only time this has presented itself happened to involve a student of color; is that correct?
A I think that's the latest one that we're all debating here.
Q Well, is there some other student of color that Kurt Dennis has said should not attend McAuliffe because they're violent and dangerous?
A Not during my time.
MR. CASE: Object to foundation.
THE DEPONENT: Sorry.
A During my time, this is the one that I recall.
Q (BY MR. LANE) Do you recall any other



incidents where Kurt Dennis has said a kid should not be at McAuliffe because this kid is violent and dangerous?
A I do not recall.
Q Okay. The second point on the exhibit is -- the allegation is Kurt spoke to "9News in an interview, divulged confidential student and legal records, and provided details that helped the reporter and the McAuliffe International community to identify the student to whom these records belonged," right?
A Yes.
Q Do you remember what identifying information he gave that allowed everybody to know who this kid was?
A Yeah. It was the release of the date of offense, several documents there. They're in here. I'm trying my best not to refer to them, but if you want me to, I can.
Q Well, we'll get there. Let me pull up a different exhibit, because I want to play the interview. And let's call this Exhibit 13. I'm going to share my screen again. Hang on a second.
MR. CASE: I mean, Counsel, do we have -- I'm a little confused by your numbering scheme here.



MR. LANE: I know. Yeah, I'm bouncing around.
MR. CASE: Is it --
MR. LANE: This is Marrero 13 and --
MR. CASE: Is technically the court reporter going to be marking these or . . .
MR. LANE: She can mark it whatever she wants, but I've got the exhibit labeled Marrero 13, and the other one is Marrero 19. So . . .
MS. SCHAEFER: David, if you -- if you want, I can help. We can start from 7 for 19 and then this will be 8. And I'll just keep track and we can label them that way for Kathy.
MR. LANE: Whatever is easiest for Kathy.
THE REPORTER: I believe we started with 6, though, Maddie. I believe 6 was the first one --
MS. SCHAEFER: Oh, okay.
THE REPORTER: -- for today. Thank you.
MS. SCHAEFER: That was 6. This will be 7 (This was later withdrawn and re-marked as 8).
Q (BY MR. LANE) Can you see the screen, Dr. Marrero?
A There is no video on the screen. I see you, everyone else who is on the call, and myself.
Q Okay. Hang on a second. Let me hit



Share.
A I see it --
Q Now do you see it?
A -- now.
Q I'm sorry?
A I see it now.
Q Okay. I'm going to play this and see -- what I want you to do -- when was the last time you saw this interview with Kurt Dennis?
A I saw it maybe a week or so after it aired.
Q Okay. When he gives -- when there is identifying information given, I want you to say Stop, okay?
A (Deponent nodded.)
Q And then I'll stop the video and you can tell me what the identifying information was, okay?
A (Deponent nodded.)
MR. CASE: Counsel, at the expense of a lot of objections and doing this a hundred times, confidential information given by whom? I don't under- --
MR. LANE: By Kurt Dennis to 9News. Okay? Are we good?
MR. CASE: That's not on the -- that's

Exhibit B
Defts.' Mot. for Summary Judgment

Q Right. I get that.
A And he was introduced as --
Q The principal.
A -- principal.
Q Right. Hang on a second. I don't know why this is not working now, but we are at the minute 37 mark. Let me see if I can refresh this.
A If you can play a little bit --
Q Yeah, I'm going to. I'm going to play the whole thing.
A Thank you.
Q Just for some reason there's some technical glitch here that is causing me some trouble. Hang on a minute. I am having a little screen sharing problem here, but hang on a minute. Let's see if I can fix it.
Okay. Give it another shot.
(The video was played and stopped.)
MR. LANE: Let me get back to where we were.
(The video was played.)
A Can you play it from right there?
Q (BY MR. LANE) Yes.
A Can you rewind it a little bit?
(The video was stopped.)



Q (BY MR. LANE) Sure. Maybe. To where?
A Just like 1-minute mark.
That should be good.
(The video was played.)
A Stop.
(The video was stopped)
Q (BY MR. LANE) Okay.
A Sorry for saying it. I didn't think you heard me the previous times.
Q Oh, I'm sorry. I didn't --
A No, no, previously, before you had to reboot.
Q Okay.
A So this -- and if I remember correctly, this is when they showed briefly all the documentation that Mr. Dennis provided on 9News.
Q Okay. Well, hang on, because this is all I've seen by way of any documentation. So on the air.
A Okay. On the air. (Inaudible.)
Q I'm not talking about what he gave 9News. I'm talking about the broadcast here.
A So that there, that redaction, although we cannot see, in the redacted statements -- first of all, I question whether they're truly redacted,



right, in terms of Mr. Dennis's correspondence to 9News.
Q Well --
A But even the ones that were redacted -- and it should come up here, if I remember correctly -- that some of the identifiable information was not redacted. Like the date of the offense, easy to look up. And those -- those cross-outs, Mr. Lane, they were not done very well, and you can make out the name of the student. And we have those in our possession.
But please continue so I can point them out.
Q Okay.
(The video was played.)
A Stop.
(The video was stopped.)
A Oh, your prompt was to identify that. I just want it noted on the record that even 9News knows that he went on in not only his professional capacity, putting his professional life at risk. Please continue.
Q (BY MR. LANE) Okay.
(The video was played and stopped.)
Q (BY MR. LANE) Okay.



A The thing I am --
(The video was played and stopped.)
Q (BY MR. LANE) Okay.
A That was -- that was another video playing, yes?
MR. CASE: I think it was a commercial or something.
Q (BY MR. LANE) Yeah, that was just a commercial. So it went on after I -- after the Kurt Dennis issue and is irrelevant to this case.
A Some good journalism there, no?
Q It's what?
A Fine job by our friends at 9News.
Q Why -- why do you say that?
A They do impeccable editing. They tell -- they tell a good story.
Q So my question to you is, what confidential information was broadcast as a result of that?
A Okay. So I identified some that would easily identify the student. The confidential breach and the FERPA violations happened in the communication and the documents provided that were not necessarily aired in this but communicated to a member of the public, being the news folks at 9News.

Exhibit B
Defts.' Mot. for Summary Judgment

And those are the redacted statements that I question, but in the redacted statements you can still identify the student very clearly.

Q Okay. Was this student named in any media that you're aware of?

MR. CASE: Object as to foundation.

A Not that I'm aware of.

Q (BY MR. LANE) Okay. Was the --

A Mr. Lane --

Q Was the school --

A Mr. Lane, if I can. I don't know if you consider social media "media." I know it has it in the title. Some folks were naming the student in, like, the Facebooks world and, you know, those -- those platforms, as a result of all of this.

Q Right. My question, though, is -- hang on one second.

Did the school learn about this kid's criminal charges through law enforcement?

MR. CASE: Object as to foundation.

Q (BY MR. LANE) In other words, how did the school district -- how did Kurt Dennis, how did you, how did everybody find out this kid was charged with attempted murder?

A Law --



MR. CASE: Object as to form.

A Documentation from law officials.

Q (BY MR. LANE) So law enforcement released that information to you, right?

A Correct, the district.

Q And you're claiming that that -- that for Kurt Dennis to release the kid's name is a FERPA violation, right?

A Absolutely.

Q Okay. You would agree that that interview is what ultimately got him fired, right?

A That was part.

Q But that was a big part. That's what sparked the whole investigation and led to all the rest of the things that you guys claimed that he was involved with, right?

A Not "claimed," sir. The evidence shows and the investigation showed that on all counts there is evidence. But just this was what prompted the investigation in terms of disclosing confidential information of a student.

Q Okay. As long as we -- we're -- we're on this video thing -- and I started to play the interview with you. I'm going to do that now, because that was the one I mistakenly started to



play. But it's up so I might as well go with it.

9News. Do you want me to start it at the beginning again?

A No. I don't care to see this.

Q Okay. Well --

A Do whatever you want.

Q This is Exhibit whatever -- this is an interview with you with 9News. Do you recall giving an interview to 9News?

A I do.

MR. LANE: Okay. Maddie, what exhibit is this, or Kathy?

THE REPORTER: It's 7.

MS. SCHAEFER: I think this will be 8.

(Deposition Exhibit 8 was marked.)

(The video was played.)

A Do you want me to stop?

Q (BY MR. LANE) Sure.

(The video was stopped.)

A I will provide some editorial. So they -- they may consider it dodging. Absolutely not. No, it was still -- no, it was -- HR prevents us from engaging. They wanted to. So I didn't -- no one was avoiding this in any -- in any capacity.

But I just want to note that not only



that I, as I mentioned earlier, engage in pat-downs. I remember back when I was a student it happening to my peers. It's incredibly unfortunately common when it comes to urban settings like ours.

You can continue.

Q Okay.

(The video was played.)

A Stop.

(The video was stopped)

A "Of a student accused of attempted murder." "A case," "Attempted murder." Redacted -- it wasn't that loosely. Redacted documents provided. You can tell who the student's name is. But even one area where it was not a redacted, it shows offense. So all it takes is someone with a curious mind to look it up, and now it's all out there. Please continue.

(The video was played and stopped.)

A That was a great interview. What do you think, Mr. Lane?

Q (BY MR. LANE) You know, great interview.

A Here's why. This is --

Q You're very photogenic.

A Well, they caught me on a good shaving day. The -- we're public servants, all right, so I

Page 81

not going to get -- I'm not going to drill down into the minutia of that.

MR. LANE: I got one -- one picture, Brent, starting with paragraph 6, apparently. I don't have the first page.

THE DEPONENT: Well, I can have someone scan this.

MR. LANE: That would be great.

MS. SCHAEFER: You need to scroll down, David.

MR. LANE: Oh.

MR. CASE: Yeah.

MR. LANE: Okay. It's in backwards order. Got it. Got it.

Q (BY MR. LANE) Did you ever talk to tony.mm?

A No. That's the person who sent this, yes?

Q Yeah.

A No.

Q Okay. And you attribute all these complaints to Kurt Dennis, right, as evidence that he is possibly a racist?

A Well, look -- look at -- yeah. Look at the date. It's shortly after --

Page 82

Q I -- I'm with -- I see the date. I'm just asking -- I mean, was Kurt in charge of who's in the school play?

A Ultimately as the principal he has final say.

Q I understand. General Dwight Eisenhower was in charge of the United States military, but he did not micromanage every bullet that got fired, right? So my question to you is, is Kurt Dennis generally picking out who's going to be in a school play?

MR. CASE: Object as to foundation.

A I don't know.

Q (BY MR. LANE) Well, come on. You probably do, don't you?

A He can run his building -- I know that when I was a principal there were certain things I leaned in on. I was a former baseball coach, so I was very much involved in who made that team.

Q Okay. And you never talked to Tony --

A Same philosophy, sir. If Dwight Eisenhower applies then, then why are we being -- why are you engaging me if I'm not involved in decisions that --

Q Well --

Page 83

A -- are beneath me?

Q -- you were involved in the decision to fire Kurt Dennis. Had you not been involved in the decision to fire Kurt Dennis I wouldn't be sitting here with you. But I don't know that Kurt Dennis has anything to do with who picks kids for a family -- or for a school play.

Did you ask Kurt, Hey, did you pick these kids? And you never talked --

A (The deponent shook his head.)

Q -- to Tony either, right?

A No. I haven't shared that with anybody. The first time I'm sharing that is now with you.

Q Okay. And we don't know how much is attributable to Kurt and how much is not, right?

A We do not know.

Q And you didn't even know that Kurt got a grant for $10,000 for the 12-year-old kid who got killed, for the funeral, right?

A Did not know.

Q Okay. Is it your belief that Kurt Dennis singled out students of color for what has been called a de-escalation room?

A Well, I know initially that was what was reported.

Page 84

Q Do you -- and your investigation showed, is that true or is that not true?

A If I remember correctly, it wasn't consistent. It was -- the issue there was the violation of policy.

Q What was the violation of policy as it applied to the de-escalation room?

A There was a lock outside of the door, which is prohibited. The student in this case was left alone, which is prohibited. And there were unsafe conditions in there. I remember wiring in the pictures that I saw, broken, you know, walls and furniture, and even like a radiator exposed, so unsafe conditions.

Q Okay.

A Those are --

Q And did Kurt Dennis ask DPS for more money to fix that room up?

A I don't recall. Not on a -- a request that we get often from all schools.

Q And the de-escalation room was approved by DPS, wasn't it?

A To have --

MR. CASE: Objection. Foundation.

A To have a de-escalation room, not the way

Exhibit B
Defts.' Mot. for Summary Judgment

supports, is it a violation of policy for that school principal to go to the media and say, DPS supports this particular piece of legislation. I think this is ridiculous. I -- I am the principal of XYZ school. I oppose this legislation?

A Well, the way that you described it, they're acting in their professional capacity, so that is a violation.

Q Okay. Do you believe that school administrators and staff and faculty have the ability to express public opinions at odds with DPS policy?

A Of course in their personal capacity.

Q So if they mention the fact that they are employed by DPS, does that then elevate it to an official capacity?

A Not necessarily.

Q What elevates it to official capacity?

A Well, being on school grounds during the school day in a school office in a school building. That's one example. The other example is during the school day going down to the legislative floor during school hours, introducing yourself as said principal. So those are two clear examples that, interestingly enough, have happened here.

Q Okay. Is there some policy that



clarifies that for faculty or staff, meaning if I'm a principal of a school and I think DPS has a -- an absolutely ridiculous policy and I want to speak out on that issue, are there guidelines issued anywhere by DPS saying, Okay. You can do that. You just can't do it on school grounds during school hours or identifying yourself as a school administrator or principal?

A There is a policy that addresses that. Now, it doesn't quite get into the specifics of that scenario that I presented.

Q Is that the general guideline that we saw in that exhibit where you're telling, Hey, Team DPS, if you're going to do this, go through channels. And you can still speak out in your personal capacity. It's sort of a general statement?

A That's correct. That's the one.

MR. LANE: Okay. All right. Well, I don't think I have any further questions. So Dr. Marrero, I appreciate your time today. And, you know, I'm sure we will continue to run into each other from time to time here.

THE DEPONENT: Well, thank you, sir. And thank you to everyone who's on the call.



VIDEOGRAPHER: Brent, any questions?

MR. CASE: No, thank you.

VIDEOGRAPHER: Okay. The time is 4:19. We are going off the record. This will conclude the deposition for this witness.

MR. LANE: Thanks.

Kathy, we'll just take the usual.

THE REPORTER: Okay. Mr. Brent, E-transcript and scanned exhibits? I mean, Mr. Case. I'm sorry.

MR. CASE: Yes, please.

THE REPORTER: And you'll handle signature?

MR. CASE: I will.

(The deposition concluded at 4:19 p.m., November 17, 2025.)



I, ALEX MARRERO, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

_____________________________

Signature of Deponent

( ) No amendments

( ) Amendments attached

Acknowledged before me this ______________ day of _________________, 20__.

Notary Public: _____________________

My Commission Expires: _____________

Seal:

Exhibit B

Defts.' Mot. for Summary Judgment