# *Dennis*

# *v.*

# *School District No 1*

---

Auon'Tai Anderson

April 29, 2026

---

AB Litigation SERVICES
216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

Q I -- I'm not -- I -- I didn't ask you a question does the name Kurt Dennis appear in the poem. I asked you whether the poem was about -- and inspired interactions with --
MR. FERO: Mr. Lane --
MR. LANE: Sorry.
Q (BY MR. LANE) Was your poem about Kurt Dennis and his interactions with students of color?
MR. FERO: Object to form.
Q (BY MR. LANE) Whether it uses his name or not.
MR. FERO: Object to form. Go ahead.
A The poem was about the use of seclusion against any student and why I do not endorse that action.
Q (BY MR. LANE) Well, who secluded students on the personnel list that you affirmed?
A Kurt Dennis.
Q So you get up, and you make an entire speech and a poem about Kurt Dennis and why you're firing him. Baldermann makes an entire speech about Kurt Dennis and why he's not voting to fire him. Did Kurt Dennis ask for some individual consideration at that board meeting?
MR. FERO: Object to form. Go ahead.



A I would need to go back and review the -- the vote.
Q (BY MR. LANE) Because you don't remember; is that it?
A Yeah. I -- I mean, we're talking about a vote three years ago.
Q Right. The most significant personnel decision you've ever made, I'm guessing; is that correct?
A That is not true. The most significant personnel decision I made was to hire the superintendent.
Q Okay. But your -- your memory has faded about whether or not -- or why you made a speech about firing Kurt Dennis and even inspired you to write a poem about it. You don't remember why that was; is that -- is that your testimony?
MR. FERO: Object to form.
A My testimony is that you are asking me do I remember us pulling Kurt Dennis's name as an individual or was he a part of the whole collective as a Personnel Transaction Report.
I believe that, you know, as counsel you all should be looking into if Kurt Dennis was pulled or not, not asking me if I recollect a vote from



three years ago.
Q I see. Thank you for your advice. My question, though, is did you make a speech about anybody else that day --
A No.
Q -- that got fired other than Kurt Dennis?
A No.
Q Why did you vote -- and -- and you -- you understand that if the majority of the board had voted like Baldermann voted, not to fire Kurt Dennis, he would not have been fired. That's your understanding, isn't it?
MR. FERO: Object to form.
A That is not my understanding.
Q (BY MR. LANE) Why do you guys vote if it has no impact on anything?
A It is a requirement of the board.
Q Why? I mean, oh, it's, like, you don't have to draw, you know, flowers on a piece of paper. That could be a requirement of the board, too.
MR. FERO: Object.
Q (BY MR. LANE) But there's a reason why you have to do things that are required by the board. Are you telling me you're unaware of whether or not, had the board voted along the lines Baldermann voted,



that Kurt Dennis would not have been fired? You don't know?
MR. FERO: Object to form.
A What you're -- what you're asking has not ever been done, at least in my tenure, that I can recall where we have somebody who was -- we went against the recommendation of the superintendent. So you're asking me to assume a reality that has never even happened in the four years that I was on the school board.
Q (BY MR. LANE) I'm asking you --
A I can't -- I can't tell you what Kurt Dennis's fate would have been if he would not have been terminated -- or affirmed to be terminated by the board.
Q So you were on the board for four years, right?
A That is correct.
Q And you voted to terminate innumerable people over those four years that --
A I affirmed the Personnel Transaction Report every board meeting.
Q But you don't know why you did that other than that's what we do; is that what you're telling me?

Exhibit JJ
Defts.' Mot. for Summary Judgment

A It is a function of the board that -- it is operational for the operations parts of our district to make recommendations. They give them to the superintendent. The superintendent gives them to the board and says, I agree with this recommendation; please vote for -- please vote in the affirmation of -- of agreeing with these termination decisions, and we go on about our day.

**Q And doesn't common sense tell you that if the board disagrees with the -- the superintendent's recommendation, the guy is not fired?**

MR. FERO: Object to form.

A I don't know what -- what common sense you may be operating from. But, again, I'm -- I'm not going to entertain a hypothetical of something I've never witnessed or been a part of.

**Q (BY MR. LANE) I'm asking you. You're -- are you familiar where the -- the powers that you had as a member of the board?**

A I am familiar with the powers that the board as a collective have. Individual board members have no power.

**Q Right.**

A The board, when it has four members together, that's a majority, and that is the board.



I am just -- I was just Director Anderson at the time.

**Q Right. My question is are you familiar with the powers that the board has?**

A I'm -- I'm familiar with the powers the board has via policy and state law.

**Q And what is -- where is this requirement that you vote to affirm the personnel decisions of the superintendent? Where -- where is that written, do you know?**

A I would have to go back and review Denver Public Schools' policy and state law.

**Q Okay. So yes or no, is it your understanding that had the board majority voted against terminating Kurt Dennis and disagreed with Marrero's decision, he would have not been fired? Is that your understanding; yes or no?**

MR. FERO: Object to form.

A No.

**Q (BY MR. LANE) Okay. What is your understanding? If the majority of the board had said, No, we agree with Baldermann, he should not be fired, what happens at that point to Kurt Dennis?**

A Well, respectfully, Scott Baldermann was protecting his re-election campaign that failed.



**Q I didn't ask you that question, did I? I didn't say, Why did Scott Baldermann vote against firing Dennis? That wasn't my question, was it?**

MR. FERO: Object to form.

**Q (BY MR. LANE) Was it?**

MR. FERO: Object to form.

A You may repeat your question then.

**Q (BY MR. LANE) Well, I'm asking you, that was not my question that you just answered, was -- I didn't ask you why Baldermann voted against firing Kurt Dennis. That was not my question, was it?**

MR. FERO: Object to form.

A No, you -- you asked about this imaginary scenario if the board would have met -- did what Scott Baldermann did, what would have happened. And I told you --

**Q (BY MR. LANE) Yes, yes.**

A -- in three different ways, I'm not going to entertain a hypothetical that I've never been a part of.

**Q Well, actually, you are going to entertain the hypothetical because that's the rules of a deposition.**

**What is your understanding -- based on your training and experience, what would have**



**happened had the board not affirmed -- the majority of the board not affirmed Marrero's decision to fire Kurt Dennis?**

MR. FERO: Object.

**Q (BY MR. LANE) What would have happened to Kurt Dennis?**

MR. FERO: Object to form.

A I'm not sure.

**Q (BY MR. LANE) Okay. If I told you that he would not have been fired, would that be a news flash to you?**

MR. FERO: Objection, form.

A I -- I don't -- I don't know.

**Q (BY MR. LANE) Okay. So as you sit here today, you believe that you really had nothing to do -- your vote had no bearing on whether Kurt Dennis did or did not get fired, as far as you know; is that right?**

A Kurt Dennis's actions of violating policy JK-R is what got him recommended for termination.

**Q That's not my question. My question to you is as you sit here today, do you believe that your vote had absolutely no bearing whatsoever on the termination of Kurt Dennis?**

A I did not agree with your question.

Exhibit JJ
Defts.' Mot. for Summary Judgment

document?

A I am familiar with that document.

Q Okay. I am going to share that document with you. It's Exhibit 51. Tell me if --

MR. FERO: I -- David, just tell me the Bates number. I'm pretty sure I have a printed copy here.

MR. LANE: Okay. It is Bates No. 135.

MR. FERO: All right.

THE DEPONENT: I got you. I got it in front of me.

MR. LANE: Okay. If it's in front of you, I'm not going to share anymore.

MR. FERO: Thanks.

Q (BY MR. LANE) You're familiar with this document, right?

A I am.

Q And this is why -- this is from human resources, Grant Guyer. Are you familiar with him?

A I am.

Q It has all the reasons why Kurt Dennis got fired, correct?

A That is correct.

Q And you agreed with these, right?

A Yes, I do agree with the -- with the --



with these.

Q Okay. Let me go through the bullet points with you. You violated -- first -- first bullet point is basically you directed McAuliffe International faculty and staff to use at least two rooms located in the school for the purpose of student seclusion.

You personally placed or directed faculty and staff to place students in these rooms without proper supervision or accompaniment, and you personally continued using or directed faculty and staff to continue using these rooms for seclusion, despite being aware that the rooms were not safe or appropriate for this purpose. That was the first bullet point, right?

A That is the first bullet point.

Q And that was your major reason for voting to terminate Kurt Dennis, correct?

A Yes, he's -- he violated the policy JK-R.

Q But that -- that was -- I mean, he -- there are other things in here, but that was the big one for you, right?

A I -- all of them were important because he violated FERPA.

Q Right. But you gave press conferences on



the incarceration rooms, and you were on Brother Jeff repeatedly talking about the incarceration rooms. And all of this other stuff did not seem to rise to the same level of importance as the first bullet point, based on my observations of you giving all of these press conferences and media appearances. Is that a fair statement?

MR. FERO: Object to form. Go ahead.

A I would say no because I -- I held multiple town halls with McAuliffe community prior to this information being brought to my attention about the use of seclusion. And I believe I took those very seriously and had multiple conversations and made myself available multiple times for various opportunities to engage with the McAuliffe community at Manual High School, at Whittier Cafe, at Brother Jeff's Cultural Center where there were town halls, and they had the opportunity to discuss this. And we actually had an entire cafeteria full of parents from McAuliffe specifically about Mr. Dennis on August 1st before this information had reached my attention.

Q (BY MR. LANE) So they are all of equal importance to you; is that what you're saying?

A They are all of equal importance. This -- this one definitely stands out, but they do all have



equal importance.

Q Okay. Let me give you a hypothetical. A kid at McAuliffe who is 5 foot 8, 140 pounds who starts throwing chairs in class, who spits and kicks and punches faculty. What is a 110-pound, 5-foot-2-inch teacher, female teacher supposed to do when that starts in her class?

MR. FERO: Objection, form, foundation. Go ahead.

A Reach out for administrative support.

Q (BY MR. LANE) How does she do that?

A The phone.

Q Okay. A cell phone, her own cell phone?

A Or press zero on the school's phone.

Q Okay.

A It's an automatic call to the office.

Q And what happens then?

A I need support in X classroom immediately. And then you get the -- the proper administrators there that can do -- utilize NCI holds that are trained in knowing how to properly restrain a student.

Q What's an NCI hold?

A It is a standard hold that is performed when a student needs to be physically restrained that

Exhibit JJ
Defts.' Mot. for Summary Judgment

doesn't disrupt -- they got shot in a bank. Do we move -- do we move the body from the -- the bank scene, and then try to get them to an area so that the customers can resume their banking? No, you got to clear the bank out and get everybody out of the bank. And you got to be able to perform whatever you need right there in the moment to address that individual's needs.

**Q Okay.**

A And then once that individual is ready to be moved, then you move that individual.

**Q Okay.**

A But you just wouldn't let everybody stay in the bank while that situation happens.

**Q All right. So go back to this kid. They -- let's say he's calmed down now, he's not struggling anymore, he's not spitting. What are these two large male administrators going to do at that point about the kid?**

A At that point, once the student has been able to calm down and de-escalate, you -- you can be able to move that student out of that classroom so that the classroom -- so that the classroom resumes learning. And then you bring -- you bring that -- counselor, mental health support, to whatever



their -- their 504 IEP plan requires. You move that space -- that student to that space or that -- there is a -- a counselor or Denver, you know, Mental Health, if they do require us to reach out to STAR or to their parents, but that's when that individual has fully calmed down.

The classroom helps the teacher -- one of you stays back to make sure the teacher can get that classroom back together, get their kids back in their learning; but we're -- we're talking about somebody with likely a -- a specialized learning plan or an IEP that may not function the way that other students function.

**Q Do you know that the only students who ever went into the McAuliffe de-escalation rooms had that in their IEPs?**

A Say that question again.

**Q Yes. The only people that Kurt Dennis ever put into a de-escalation room had the de-escalation room as part of their IEPs.**

A Kurt Dennis does not have de-escalation rooms, we have seclusion rooms.

(The court reporter interrupted for clarification of the record.)

**Q Let's just call them the rooms.**



THE COURT REPORTER: I need the answer again.

A Kurt Dennis did not have de-escalation rooms, he had seclusion rooms.

THE COURT REPORTER: Thank you.

**Q (BY MR. LANE) Well, according to you, he didn't have seclusion rooms either, he had incarceration rooms, right?**

A No, that's actually the phrasing of staff that worked in the building that submitted a work order for repair, and it said, Used for students' rage and incarceration. So, therefore, the term incarceration came from staff working in the building.

**Q By the way, who is the anonymous tipster that -- that tipped you off to all this?**

A I do not know the person's identity.

**Q That person remained anonymous to you?**

A That person remained anonymous, that's correct.

**Q Have you ever called those rooms incarceration rooms?**

A I have. I've utilized the words from the staff at McAuliffe. That word did not originate with me, though.



**Q I didn't ask if it originated with you. You have called them incarceration rooms, have you not?**

A I -- yes, I have quoted the staff who have seen the rooms.

**Q Okay. So Kurt Dennis calls them de-escalation rooms, you have called them seclusion rooms and incarceration rooms. But when we're talking about these rooms, let's just call them the rooms, okay?**

A I would like to make sure that we utilize the proper framing. They were seclusion rooms. Those were being monitored of -- of seclusion.

**Q Well, you can call them whatever you want.**

**So are you aware that the only kids put into those rooms had, as part of their IEPs, that -- that they are to be in de-escalation rooms?**

A I have not read the IEPs for any of the students that are -- have been placed in that room.

**Q Well, I didn't ask you if you've read them, I just asked you are you aware that the only kids who Kurt Dennis ever put into these rooms had, as part of their IEP, they were to be put in de-escalation rooms to de-escalate?**

A I -- I can't affirm or deny what you're

**Kurt Dennis's advocacy for white supremacy?**

A Do I believe that every black student placed into the room is -- say that one more time.

**Q Is a manifestation of white supremacy by Kurt Dennis.**

A I -- I mean, if you're asking me do I believe Kurt Dennis is a racist, that's -- that's -- that's one question. I -- I would -- I believe that the investigation stated that there was not sufficient evidence to say that Kurt Dennis only put kids of color in the rooms because of the color of their skin.

**Q Do you think that was part of why he was putting those kids into the room?**

A I don't believe that that was the rationale of why he was putting the kids in the room, solely on the basis of their race.

**Q Do you believe that any of your public statements equating these rooms with white supremacy and oppression paints a picture in the public's eye that Kurt Dennis is a racist?**

MR. FERO: Objection, form and foundation.

A No.

**Q (BY MR. LANE) Did -- have you not stated to the media that -- hang on one second.**



**Have you made public statements talking about how putting black students and students of color into these rooms, at the very least, is implicit bias?**

A I -- I would likely have made a statement like that, yes.

**Q And Kurt Dennis is the guy putting these kids into these rooms, right?**

A He's one of the individuals putting them into the room.

**Q Well, it was all done under his direction and supervision, according to you, right?**

A I believe that my -- my public press conference, the first thing that I said were whomever may or may not have been a part of this, so it's -- it's him and whoever may or may not have been a part of this should also be facing consequences for their actions.

**Q Well, did anybody else, besides Kurt Dennis, get any -- any discipline for these so-called seclusion or incarceration rooms?**

A Yes.

**Q Who else?**

A I believe the former principal or the former interim principal, Michael Claiborne. I



believe that there were other members of the administration team, counselors that were -- that were disciplined in one way or another about their involvement of violating JK-R.

**Q Okay. Do you believe Kurt Dennis is a racist?**

A I -- I believe that the racists would think that he's a racist.

**Q The racists would think that he's a racist? That wasn't my question. I'm not sure what that actually means, but do you think he's a racist?**

MR. FERO: Object to form. Go ahead.

A My statement stands. I believe that those who enable racism, they believe that Kurt Dennis may be friendly for them.

**Q (BY MR. LANE) Look, I'm not afraid to say I think Donald Trump is a racist. He embraces racism, all -- he's got a lot of racist friends, okay? I have an opinion about that. And, yeah, all of the racists love Donald Trump. He may not be a cross-burning Klansman; but, you know, he's on the sliding scale. He's a racist. Where -- I mean, is that what you're saying about Kurt Dennis? The racists would think he's one of them. You know, do you think he's a racist?**



MR. FERO: Object to form. Go ahead.

A I think that anybody that utilizes practices that echo -- that echo a traumatic time for the descendants of slaves and utilizes systems and spaces which would echo the -- those who have been impacted by slavery and the enslavement of African Americans definitely has spaces of growth where they would need to reconsider their anti-racist values if they are espousing to be anti-racist.

**Q Is that a yes or a no, you believe Kurt Dennis is or is not a racist?**

MR. FERO: Object to form.

A Yes.

MR. LANE: Okay. We've been going for about over an hour. Let's take a ten-minute break, and we'll get back to it. And anytime you need a break, just say, I need a break, okay, Mr. Anderson?

THE VIDEOGRAPHER: The time is 10:17. We're off the record.

(Recess taken, 10:17 a.m. to 10:35 a.m.)

THE VIDEOGRAPHER: The time is 10:35. We're back on the record.

**Q (BY MR. LANE) Mr. Anderson, I'd like you to go back to Exhibit 51, which is the Revised Notice Of Dismissal From Employment. Do you have that in**

Exhibit JJ

Defts.' Mot. for Summary Judgment